# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BURTON WIAND, as
Receiver for EquiAlt
LLC, EquiAlt Fund,
LLC, Fund II, LLC,
EquiAlt Fund III, EA
SIP, LLC, EquiAlt
Secured Income Portfolio
REIT,

      Plaintiff,                      Case No.: 8:21-cv-00361-SDM-AAS

v.

FAMILY TREE ESTATE
PLANNING, LLC, et al.,

      Defendants.

_____/

## AMENDED COMPLAINT

Burton W. Wiand (the "**Receiver**"), as Receiver for EquiAlt LLC, EquiAlt Fund, LLC, EquiAlt Fund II, LLC, EquiAlt Fund III, EA SIP, LLC, and EquiAlt Secured Income Portfolio REIT (collectively, the "**EquiAlt Entities**"), by and through his undersigned counsel, hereby files suit against the parties identified in paragraphs 13 through 48 of this complaint (collectively, the "**Defendants**") and alleges as follows:

## INTRODUCTION

1.     On February 11, 2020, the Securities and Exchange Commission ("**SEC**") filed a complaint (Doc. 1) against (1) defendants Brian Davison ("Davison"); Barry Rybicki ("Rybicki"); EquiAlt LLC; EquiAlt Fund, LLC; EquiAlt Fund II, LLC; EquiAlt Fund III, LLC; EA SIP, LLC ("collectively "**EquiAlt defendants**") (collectively, the "**defendants**") and (2) relief defendants 128 E. Davis Blvd, LLC; 310 78th Ave, LLC; 551 3rd Ave S, LLC; 604 West Azeele, LLC; 2101 W. Cypress, LLC; 2112 W. Kennedy Blvd, LLC; 5123 E. Broadway Ave, LLC; Blue Waters TI, LLC; BNAZ, LLC; BR Support Services, LLC; Bungalows TI, LLC; Capri Haven, LLC; EA NY, LLC; EquiAlt 519 3rd Ave S., LLC; McDonald Revocable Living Trust; Silver Sands TI, LLC; TB Oldest House Est. 1842, LLC. (collectively, the "**relief defendants**"). The foregoing corporate defendants and relief defendants are referred to as the "**Receivership Entities**." *See S.E.C. v. Brian Davison, et al.*, Case No. 8:20-CV-325-T-35AEP (M.D. Fla.) (the "**SEC Action**").

2.     The SEC alleged that the defendants in the SEC Action have violated Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§77e(a) and 77e(c); Sections 17(a) of the Securities Act, 15 U.S.C. §77q(a); and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Exchange Act Rule 10b-5,17 C.F. R. §240.10b-5 against all defendants in the SEC action. Additionally, the SEC alleged that Messrs. Davison and

Rybicki had violated Section 20(a) of the Exchange Act, 15 U.S.C. §78(t)(a). Finally, the SEC claimed that Davison, Rybicki and EquiAlt LLC had aided and abetted in the violation of Section 15(b) of the Exchange Act. 15 U.S.C. §78(o). Accordingly, the SEC brought the SEC Action seeking the following relief: temporary restraining order, preliminary injunctive relief, permanent injunction, asset freeze, appointment of a receiver, records preservation, sworn accounting, disgorgement, prejudgment interest, and civil money penalties.

3.     On February 14, 2020, the Court entered an order appointing Burton W. Wiand as temporary Receiver for the Receivership Entities (Doc. 11) (the "**Order Appointing Receiver**").  The Court directed him, in relevant part, to "[t]ake immediate possession of all property, assets and estates of every kind of the Corporate Defendants and Relief Defendants . . . and to administer such assets as is required in order to comply with the directions contained in this Order." *See id.* at ¶1.

4.     On that same date, the Court also entered a Temporary Restraining Order (Doc. 10) imposing a temporary injunction against the defendants and relief defendants, freezing their assets, and required an accounting from Messrs. Davison and Rybicki related to monies they received from EquiAlt as well as an accounting of all assets and accounts for EquiAlt and the EquiAlt Funds.

5. On July 31, 2020, the Receivership Court held a show cause hearing on the SEC's Preliminary Injunction Motion. On August 18, 2020, the Court entered an order granting the SEC's motion for entry of a preliminary injunction. The Court's Order found that "the evidence shows that the Defendants most likely operated as a Ponzi scheme using new investor funds to pay old investor obligations while simultaneously siphoning funds for their own benefit." (Doc. 184 at 2) Additionally, the Court found that the "Defendants appear to have had equally shared responsibilities and acted in concert to successfully perpetrate the Ponzi scheme." *Id.* at 4.

6. In the Court's Order Appointing Receiver, the Court authorized the Receiver to "[i]nvestigate the manner in which the affairs of the Corporate Defendants and Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of the Corporate Defendants and Relief Defendants and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred money or other proceeds directly or indirectly traceable from investors in EquiAlt Fund, LLC, EquiAlt Fund II, LLC, EquiAlt Fund III, LLC, and EA SIP, LLC, their officers, directors, employees, affiliates, subsidiaries, or any persons acting in concert or

participation with them, or against any transfers of money or other proceeds directly or indirectly traceable from investors in EquiAlt Fund, LLC, EquiAlt Fund II, LLC, EquiAlt Fund III, LLC, and EA SIP, LLC; provided such actions may include, but not be limited to, seeking imposition of constructive trusts, disgorgement of  profits, recovery and/or avoidance of fraudulent transfers, rescission and restitution, the collection of debts, and such orders from this Court as may be necessary to enforce this Order." Doc. 11 at ¶2.

7.     The Receiver files this complaint pursuant to the authority granted in the Order Appointing Receiver, the principles governing federal equity receiverships, and pertinent law, including the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101, *et seq.* ("**FUFTA**").

8.     The Receiver brings this action to recover monies transferred to each Defendant, either directly or by subsequent transfers, by principals Insiders Brian Davison and Barry Rybicki (**"the Insiders"**) through or on behalf of the EquiAlt Entities for "commissions" and other "fees" for fraudulent debentures sold to investors.

9.     In some instances, the Individual Defendants in this case received commissions for their sales of EquiAlt debentures. In other circumstances, the Individual Defendants received overrides on commissions paid to other sales agents. All of these payments were made in furtherance of

the ponzi scheme. The making of the payments and the receipt thereof were in large part in violation of state and federal securities laws.

10.   The Defendant sales agents and their organizations did not provide reasonably equivalent value for the transfer of these commissions as providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value. These fraudulent transfers were not derived from legitimate activity but rather from money the Ponzi perpetrators stole from defrauded investors and made in furtherance of the EquiAlt scheme to defraud.  The Receiver is entitled to recover the transfers under governing law.

## JURISDICTION AND VENUE

11.   This court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1692, which provide jurisdiction over receivership property, including money and the individuals in possession of that money, and authorize nationwide service of process.  The Receiver has complied with the statutory requirements.

12.   Schedules of the fraudulent transfers the Receiver seeks to recover from the Defendants are attached to this complaint as "**Exhibit 1**." The Defendants are arranged by the amount of commissions they received in descending dollar amount, and as referenced in Exhibit 1.  Upon information and belief, the Individual Defendants received payments from the Corporate

Defendants as commissions, overrides or other fees. These subsequent transfers are also being sought by the Receiver and are encompassed in the transfers detailed in Exhibit 1. The details of these subsequent transfers will be more fully determined through discovery. By way of example, the Plaintiff attaches Exhibit 2, an email thread between Individual Defendant Barry Wilken and Barry Rybicki regarding commission payments and overrides.

13.     Defendant Family Tree Estate Planning, LLC ("Family Tree") is an Arizona limited liability company with a principal place of business in Scottsdale, Arizona.

14.     Defendant Jason Wooten is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Wooten is the principal of Family Tree. The transfers the Receiver seeks to recover from Family Tree and Wooten are set forth in Exhibit 1 at Page 1.

15.     MASears LLC d/b/a Picasso Group ("Picasso") is a Nevada limited liability company located with a principal place of business in Las Vegas, Nevada.

16.     Defendant DeAndre P. Sears is, and was at all times mentioned herein, an individual citizen of the State of Nevada and currently resides in that state. Defendant Sears operated and controlled MASears and was identified in certain EquiAlt offering materials as President of Business

7

Development and Marketing, Managing Director of Investors or Vice President of Investor Relations. The transfers the Receiver seeks to recover from Picasso and Sears are set forth in Exhibit 1 at Page 7.

17.    Defendant American Financial Security, LLC ("American Security") is an Arizona limited liability company with a principal place of business in Prescott, Arizona.

18.    Defendant American Financial Investments, LLC ("American Financial") is an Arizona limited liability company with a principal place of business in Prescott, Arizona.

19.    Defendant Ronald F. Stevenson is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Stevenson and his deceased wife Barbara were the sole members of and controlled the operations of American Financial and American Security. The transfers the Receiver seeks to recover from American Security, American Family and Stevenson are set forth in Exhibit 1 at Page 13.

20.    Defendant Live Wealthy Institute, LLC ("Live Wealthy") is a Wyoming limited liability company with offices in Huntington Beach, California.

21.    Defendant Dale Tenhulzen is, and was at all times mentioned herein, an individual citizen of the State of Wyoming, and currently resides

8

in that state. Defendant Tenhulzen solely owned and controlled Live Wealthy. The transfers the Receiver seeks to recover from Live Wealthy and Tenhulzen are set forth in Exhibit 1 at Page 21. Additionally, upon information and belief, Tenhulzen received monies from EquiAlt Entities related to his purchase of the property located at 6711 Morning Tide Drive, Huntington Beach, California. The Receiver seeks to recover these monies as well.

22.    Defendant Ernest "Cal" Babbini is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Further, Babbini was involved with investor relations and customer communications for EquiAlt. The transfers the Receiver seeks to recover from Babbini are set forth in Exhibit 1 at Page 28. Babbini's compensation was based on sales of investments that he supervised, administered, directed and/or completed.

23.    Defendant Joseph Financial Inc. ("Joseph Financial") is a California corporation with a principal place of business in San Diego, California.

24.    Defendant Bobby Joseph Armijo is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Defendant Armijo is the principal of Joseph

Financial. The transfers the Receiver seeks to recover from Joseph Financial and Armijo are set forth in Exhibit 1 at Page 40.

25.     Defendant Elliott Financial Group, Inc. ("Elliott Financial") is an Arizona corporation with a principal place of business in Peoria, Arizona.

26.     Defendant Todd Elliott is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Elliott is the principal of Elliott Financial. The transfers the Receiver seeks to recover from Elliott Financial and Elliott are set forth in Exhibit 1 at Page 43.

27.     Defendant Lifeline Innovations & Insurance Solutions LLC ("Lifeline Innovations") is a California limited liability company with a principal place of business in Pleasanton, California.

28.     Defendant John Marques is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Defendant Marques is the president of Lifeline Innovations. The transfers the Receiver seeks to recover from Lifeline and Marques are set forth in Exhibit 1 at Page 47.

29.     Defendant Greg Talbot is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Defendant Talbot is the vice-president of Lifeline Innovations. The

transfers the Receiver seeks to recover from Talbot are set forth in Exhibit 1 at Page 51.

30.     Defendant Rokay Unlimited, LLC ("Rokay") is an Arizona limited liability company with a principal place of business in Peoria, Arizona.

31.     Defendant Anthony R. Spooner is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Spooner is the principal of Rokay. The transfers the Receiver seeks to recover from Rokay and Spooner are set forth in Exhibit 1 at Page 53.

32.     Defendant Seek Insurance Services, LLC ("Seek Insurance") is an Arizona limited liability company with a principal place of business in Peoria, Arizona.

33.     Defendant James D. Gray is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Gray is the principal of Seek Insurance. The transfers the Receiver seeks to recover from Seek Insurance and Gray are set forth in Exhibit 1 at Page 58.

34.     Defendant John E. Friedrichsen is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. At certain times, Friedrichsen held the title of

Vice President, Business Development for EquiAlt. He also worked through Bay Area Benefits Insurance Services, Inc. The transfers the Receiver seeks to recover from Freidrichsen are set forth in Exhibit 1 at Page 60.

35.    Defendant The Financial Group, LLC ("Financial Group") is an Arizona limited liability company with a principal place of business in Phoenix, Arizona.

36.    Defendant Patrick J. Runninger is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Runninger is the principal of Financial Group. The transfers the Receiver seeks to recover from Financial Group and Runninger are set forth in Exhibit 1 at Page 62.

37.    Defendant GIA, LLC ("GIA") is a California limited liability company with a principal place of business in Orange, California.

38.    Defendant Edgar Lozano is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Defendant Lozano is the principal of GIA. The transfers the Receiver seeks to recover from GIA and Lozano are set forth in Exhibit 1 at Page 64.

39.    Defendant Agents Insurance Sales ("Agents Insurance") is a California corporation with a principal place of business in San Diego, California.

40.     Defendant Barry Wilken is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. Defendant Wilken is the principal of Agents Insurance. The transfers the Receiver seeks to recover from Agents Insurance and Wilken are set forth in Exhibit 1 at Page 65.

41.     Defendant J. Prickett Agency ("Prickett Agency") is a Kansas corporation with a principal place of business in Wichita, Kansas.

42.     Defendant Joe Prickett is, and was at all times mentioned herein, an individual citizen of the State of Kansas, and currently resides in that state. Defendant Prickett is the principal of Prickett Agency. The transfers the Receiver seeks to recover from Prickett Agency and Prickett are set forth in Exhibit 1 at Page 66.

43.     Defendant Barry Neal is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. The transfers the Receiver seeks to recover from Neal are set forth in Exhibit 1 at Page 68.

44.     Defendant Ben Mohr is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. The transfers the Receiver seeks to recover from Mohr are set forth in Exhibit 1 at Page 69.

45. Defendant Marketing Dynamics Inc. ("Marketing Dynamics") is an Arizona corporation with a principal place of business in Mesa, Arizona.

46. Defendant Tim Laduca is, and was at all times mentioned herein, an individual citizen of the State of Arizona, and currently resides in that state. Defendant Laduca controls Marketing Dynamics. The transfers the Receiver seeks to recover from Marketing Dynamics and Laduca are set forth in Exhibit 1 at Page 70.

47. Defendant J. Wellington Financial, LLC ("Wellington") is a Michigan limited liability company with a principal place of business in Bloomfield Hills, Michigan.

48. Defendant Jason Jodway is, and was at all times mentioned herein, an individual citizen of the State of Michigan, and currently resides in that state. Defendant Jodway controls Wellington. The transfers the Receiver seeks to recover from Wellington and Jodway are set forth in Exhibit 1 at Page 71.

49. "Corporate Defendants" in this Amended Complaint refers to Family Tree, Picasso, American Security, American Financial, Live Wealthy, Joseph Financial, Elliott Financial, Lifeline Innovations, Rokay, Seek Insurance, Financial Group, GIA, Agents Insurance, Prickett Agency, Marketing Dynamics and J. Wellington Financial.

50.     "Individual Defendants" in this Amended Complaint refers to Jason Wooton, DeAndre Sears, Ronald Stevenson, Dale Tenhulzen, Ernest Babbini, Bobby Armijo, Todd Elliott, John Marques, Greg Talbot, Anthony Spooner, James Gray, John Friedrichsen, Patrick Runninger, Edgar Lozano, Barry Wilken, Joe Prickett, Barry Neal, Ben Mohr, Tim Laduca and Jason Jodway.

51.     The Court has subject matter jurisdiction over this case pursuant to 7 U.S.C. § 13a-1, 28 U.S.C. § 754, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367.  The Receiver brings this complaint to accomplish the objectives of the SEC Action and the Order Appointing Receiver, and thus this matter is ancillary to the Receivership Court's exclusive jurisdiction over the receivership estate.

52.     Venue in this District and Division is proper under 28 U.S.C. § 754, as this proceeding is related to the SEC Action pending in this District, and the Receiver was appointed in this District.

**OTHER PARTIES AND RELATED INDIVIDUALS AND ENTITIES**

53.     Burton W. Wiand is the duly appointed and acting Receiver for the EquiAlt Entities and other corporate defendants and relief defendants in the SEC Action.  He is a citizen of Florida and a resident of Pinellas County, Florida.

54.     EquiAlt, LLC ("**EquiAlt**") is a Nevada limited liability corporation based in Tampa, Florida. Its sole manager is EquiAlt Fund, LLC, also formed in Nevada.  Brian Davison served as the owner and CEO of EquiAlt. EquiAlt's primary role was to manage the EquiAlt Funds – EquiAlt Fund, EquiAlt Fund II, EquiAlt Fund III, EA SIP and EquiAlt Secured Income Portfolio REIT ("**EquiAlt Funds**").

55.     EquiAlt Fund ("**Fund I**") is a Nevada limited liability corporation based in Tampa, Florida. Its sole manager is EquiAlt. Fund I was formed in May 2011. Fund I raised approximately $132.9 million from at least 733 investors from January 2011 through November 2019.

56.     EquiAlt Fund II ("**Fund II**") is a Nevada limited liability corporation based in Tampa, Florida. Its sole manager is EquiAlt. Fund II was formed in April 2013. Fund II raised approximately $48.9 million from at least 266 investors from 2013 to November 2019.

57.     EquiAlt Fund III ("**Fund III**") is a Nevada limited liability corporation based in Tampa, Florida. Its sole manager was EquiAlt. Fund III was formed in June 2013. Fund III raised approximately $2.55 million from investors from 2013 to December 2015.

58.     EA SIP Fund ("**EA SIP**") is a Nevada limited liability corporation based in Tampa, Florida. Its sole manager is EquiAlt. EA SIP was formed in

May 2016. EA SIP raised approximately $19.5 million from 138 investors from 2016 to November 2019.

59.     EquiAlt Secured Income Portfolio REIT, Inc. (**"REIT"**) is a Maryland corporation based in Tampa, Florida.

60.     Fund I, Fund II, Fund III, EA SIP and REIT are creditors of, at minimum, the Insiders under pertinent fraudulent transfer law.  The Order Appointing Receiver[1] transferred control of these entities to the Receiver. As such, the Receiver now controls Fund I, Fund II, Fund III EA SIP and REIT which have been cleansed of their former owners' wrongdoing and are thus entitled to the return of fraudulently transferred funds.

61.     Brian Davison controlled the Tampa operations for EquiAlt and the EquiAlt Funds. Commission payments related to the debentures sold on behalf of EquiAlt Funds were paid from the EquiAlt Funds' bank accounts at Wells Fargo and/or Bank of America. These bank accounts were controlled by Mr. Davison or those who acted at his direction.

62.     Barry Rybicki, resident in the Phoenix/Scottsdale area of Arizona, managed and coordinated the sales force which sold the debentures to the EquiAlt investors. Mr. Rybicki controlled BR Support Services ("**BRSS**") and its predecessor, NV Support Services. BRSS was an entity used

---

[1] The Court in the SEC Action expanded the Receivership on August 17,2020 to include EquiAlt Secured Income Portfolio REIT, Inc. and other entities related to EquiAlt's REIT and QOZ funds. (Doc. 184).

by the Insiders in furtherance of their fraudulent scheme. BRSS made payments from its accounts at JPMorgan Chase to the Defendants.

63.     After one of the Individual Defendants, or sales agents within the Defendants' organizations, would sell an investment in one of the EquiAlt Funds, file materials related to the sale (subscription agreement, questionnaire, debenture, etc.) would be submitted directly to Rybicki.

64.     Often times the Defendant would directly deposit the investment funds into the appropriate EquiAlt bank account.

65.     Upon receipt of these materials, Rybicki would submit a Check Request Form to the Tampa office of the EquiAlt Entities. This form would note the investor name, amount invested, the debenture duration and interest rate, and the 12% amount of commission to be paid.

66.     Thereafter, the Tampa office of the EquiAlt Entities, under Davison's direction and control, would pay the commission, typically through direct deposit to BRSS' account.

67.     Rybicki, or those at his direction, would then distribute commissions or finder's fees to the Defendants (generally 6% of the invested amount) and BRSS (Rybicki) would retain the remaining funds.

68.     The Defendants had sales agents working within their organizations that were soliciting purchases of EquiAlt debentures. BRSS would pay the commissions for those sales to the Corporate Defendants.

18

Upon information and belief, the Individual Defendants would retain or be paid an override on the commissions paid to these other sales agents.

69. Rybicki, and the operation in Arizona he managed, were responsible for recruiting the sales agents who dealt with the investors. Almost without exception, these agents were not registered to sell securities. While the idea that one could sell these products without being registered is notoriously inaccurate, people involved with the scheme and certain of the Defendants were advised that registration was required but chose to ignore the warnings and to continue to willfully and intentionally violate the broker-dealer registration laws.

70. One exception in these Defendants is Jason Jodway who is licensed through FINRA. However, the one investment that Jodway sold, the commission was paid to J. Wellington Financial, not his broker-dealer. He never disclosed to his broker-dealer that he was involved in selling away when he sold the EquiAlt investment. Jodway/J. Wellington's W-9 is attached hereto as Exhibit 3 which shows that the taxpayer is an individual/sole proprietor or single member LLC.

71. Ron Stevenson and Todd Elliott are registered investment advisors in Arizona, while Bobby Armijo is a registered investment advisor in California. Such registration does not allow a person to sell securities and has no impact on the fraudulent sales made by these individuals.

72.    On May 22, 2008, Mr. Davison filed a Chapter 7 petition in the United States Bankruptcy Court for the District of Nevada.   He listed approximately $563,000 in liabilities, almost $600,000 in debt, including taxes and delinquent credit card payments.  The bankruptcy was discharged on August 25, 2008.

73.    Barry Rybicki filed a Chapter 7 petition in the United States Bankruptcy Court for the District of Arizona on October 15, 2008. He had a total of $913,467 of non-priority unsecured debt. The bankruptcy was discharged on January 26, 2009.

74.    Despite their bankruptcies, Davison formed EGPP, LLC in December 2009. Davison and Rybicki formed EquityAlt and EquityAlt Fund in May 2010, the precursor entities to EquiAlt and the EquiAlt Funds. Initially EquiAlt was a DBA of EGPP but was later formed as an LLC.

## FACTS COMMON TO ALL CAUSES OF ACTION

75.    The Insiders defrauded investors through their control of the EquiAlt Entities.  No investor in the EquiAlt Entities received <u>actual</u> profits from the real estate development touted by the EquiAlt Funds. Many investors never received any interest payments from the EquiAlt Entities, or they received interest in an amount that was less than the amount they invested.  As such, each of those investors suffered a net loss.

76.     On the other hand, some investors received interest from the EquiAlt Entities and principal redemptions in an amount that exceeded the amount they invested.  As such, each of those investors experienced a net gain – *i.e.*, false profits.  Whether characterized as interest, growth or return of principal, all transfers to investors were funded exclusively with money stolen from other investors.  As such, the Insiders operated the EquiAlt Entities as a classic Ponzi scheme.  *See, e.g., Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be high returns, but which are in reality a return of their own principal or that of other investors.").

77.     Some of the offering materials used by the Defendants stated that commissions were not being paid on the sale of the debentures. None of the Defendants disclosed to their investor clients the amount of commissions they received.

78.     Other offering materials used by the Defendants stated that the particular Fund may pay commissions of up to 10% or 12%. In fact, commissions of 10-14% were always paid on these investments and the Defendants did not disclose this fact to their investor clients. Nor did the Defendants disclose that their sales activities were illegal.

79.   The Defendants received commissions for their sale of the EquiAlt Funds to the investors. Their sales activities were in furtherance of the fraudulent scheme to defraud investors. The Receiver seeks to avoid these transfers under FUFTA.  In the alternative, the Receiver seeks disgorgement of the transfers pursuant to equitable claims of unjust enrichment.

### A.   Insiders Operated the EquiAlt Entities as a Common Enterprise

80.   Although investors invested in certain of the EquiAlt Funds, there was no meaningful distinction between them. Each of the Funds was managed by EquiAlt and controlled by the Insiders.  The EquiAlt Funds were all part of the ongoing and continuous scheme to defraud.

81.   The offering materials for each of the Funds were substantially similar. Further, the funds and assets of the EquiAlt Funds were commingled.

82.   On September 25, 2018, Barry Rybicki sent the following email to certain EquiAlt employees and outside sales agents (including Individual Defendants Stevenson, Neal, Mohr, Armijo, Lozano, Elliott, Wooten, Laduca, Talbot, Gray, Prickett and Marques).

> We are happy to announce that our Fund 1 offering has been filled.  We can no longer take investment into Fund 1 as a result of the investment threshold being met.  We will however be moving forward with Fund 2 and I have attached the paperwork so please begin to use this paperwork moving forward, I have also attached the banking information just in case you want to use that to make the deposit

yourself versus sending the checks in to the office. Just to clarify and answer any potential question, Fund 2 is an identical product to Fund 1 and has been in operation since 2013 so there is zero difference between the activities of both funds.

83.     These investments were sold without registration with either state or federal regulatory agencies. The offerings were purportedly made pursuant to federal exemptions from registration under the provisions of the Securities Act of 1933 provided in Regulation D.  However, none of the first four Receivership Funds qualified for a Regulation D exemption or any other exemption from registration.   The offerings appear to be one continuous fraudulent offering of unregistered securities.  The lack of any exemption was clear to the perpetrators from the language contained in offering documents delivered to investors.

84.     EquiAlt and the EquiAlt Funds shared the same offices and employees, commingled funds, and operated under one overarching name – "EquiAlt."

## B.     The Insiders Operated the EquiAlt Entities as a Ponzi Scheme

85.     From as early as 2011 through January 2020, the Insiders and others raised over $168 million in 1686 distinct transactions on behalf of one or more of the EquiAlt Entities through the offer and sale of securities, in this case debentures, in the EquiAlt real estate development scheme, as part of a single, continuous Ponzi scheme (the "**scheme**").

86.     In relevant part, the Insiders and others represented to investors and potential investors that their money would be used to purchase and renovate revenue-generating real estate properties in distressed real estate markets.

87.     The investments sold were three or four year debentures of the various EquiAlt Funds providing a fixed annual income of 8-12%. Later, EquiAlt offered a "growth" option, wherein no interest was paid but rather the investment, on paper, was "growing" at the advertised rate. In fact, the investment was not growing at all.

88.     Insiders and others fraudulently marketed investments in the EquiAlt Funds as "secure," "safe," "low risk," and "conservative."

89.     Upon information and belief, investors transferred money to the EquiAlt Entities based on these representations.

90.     Investors were never told that their interest payments were dependent upon funds raised from future investors.

91.     EquiAlt did not disclose the personal bankruptcies of the Insiders.

92.     Further, although the offering materials stated that commissions may be paid, in fact, commissions were always paid in the range of 10-14%.

93.     The offering materials indicated that 90% of the investors' funds would be invested in real estate when in fact that was factually impossible

24

given the amount of commissions being paid on the investments. Over time, less that half of the money actually raised was invested in real estate.

94.     The offering materials presented no financial information and did not accurately or fully describe the methods and fees that were used to bleed money from the Receivership Funds for the use by Rybicki and Davison.  As an example, there was no disclosure of any loans or monies owed by the Funds to either Davison or Rybicki, yet:

a.  Fund I paid $3,435,000 to Mr. Rybicki allegedly for "Principle [sic] Reduction." He also received a $250,000 bonus from Fund II.

b.  Mr. Davison received $4,660,250 from Fund I for "Principle [sic] Return" or "Principle [sic] Reduction." He received more than $3,060,000 from Fund II for similar purposes.

c.  McDonald Revocable Living Trust of which Brian Davison was the trustee received $2,100,000 from Fund I and $1,800,000 from Fund II also for "Principle [sic] Return" or distributions.

95.     Never during the life of these EquiAlt Funds were revenues from the rental of real properties or other sources (other than investor funds) sufficient to meet the overwhelming debt service obligations that were being created by the debentures that were being sold. This was not disclosed to the investors at the time they invested nor at any time through the operation of the EquiAlt Funds.

96.   The representations made by EquiAlt, were patently false, and in fact (a) tens of millions of dollars raised were used for Ponzi payments and unauthorized personal and business expenses; (b) investor returns were completely fraudulent and funded by Ponzi payments of new investor money repaying older investors; (c) the EquiAlt Funds were never profitable and consistently operated in the red; (d) returns were not from rental income, but were, again, Ponzi payments of new investor money repaying older investors.

97.   In truth, the EquiAlt Entities derived their assets from investors' principal investments, which were commingled on numerous occasions. Investors were never advised that the EquiAlt Funds were in fact insolvent.

98.   Specifically, the Receiver's forensic accountants have conducted an analysis of the income generated from operations (i.e. rental income, etc.) compared to commissions and interest paid on the Fund's investments. From the outset of operations, the EquiAlt entities never generated enough operational revenue to cover the expenses of the EquiAlt scheme.

99.   The overwhelming source of inflows to the accounts for the EquiAlt Funds appears to have been money, directly or indirectly, from defrauded investors.

100.   The Insiders transferred millions of dollars from EquiAlt and the EquiAlt Funds to the Insiders or to others on behalf of the Insiders.

101.   The Insiders transferred more than $18 million dollars from the EquiAlt Entities through BRSS to the Defendants to pay undisclosed illegal commissions directly from the investors' investments.

102.   These commissions were paid despite the lack of any profits generated from the EquiAlt scheme. In other words, the Insiders used investor money to make commission payments to the Defendants because the operational revenues of the EquiAlt properties were not sufficient to make these payments or satisfy the funds' obligations to pay interest and/or principal to the investors.

103.   The EquiAlt Entities' financial performance as represented to investors and potential investors from the inception of the scheme were false and were based on fabricated numbers created by the Insiders.   The true financial results of the EquiAlt business was never reported to investors or potential investors.

104.   From 2012 to 2019, the Insiders caused the EquiAlt Funds to pay $20,824,767 in fees ("**Fees**") to EquiAlt. These fees were couched in various ways – management, commission, discount, due diligence, advertising/marketing, and placement fees. The Fees went to EquiAlt LLC, which was nothing but an ATM for Mr. Davison. From EquiAlt, Mr. Davison received $1,702,000 in salary and $2,617,388 in non-salary. Additionally,

EquiAlt paid more than $15 million on Mr. Davison's behalf, for cars, watches, property improvements and credit card payments to name a few.

105.   These Fees were based on arbitrary valuations and percentages and were not reflective of services provided rather it allowed for the Insiders to improperly and wrongfully divert money from the EquiAlt Entities.

106.   The Insiders were responsible for the EquiAlt Funds paying BRSS over $24 million. Although BRSS paid commissions to Defendants and other sales agents from this money, Mr. Rybicki still received $2,031,944 directly from BRSS and BRSS paid $6,749,644 on behalf of Mr. Rybicki.

107.   Aside from paying Fees, the Insiders caused the EquiAlt Entities to make transfers to investors that the operations and performance of the EquiAlt Entities never supported.   Through those transfers, the Insiders improperly and wrongfully diverted money from the EquiAlt Entities.

108.   Similarly, following requests from investors for redemptions of their principal investments, the Insiders intentionally and wrongfully caused the EquiAlt Entities to pay relevant investors sums of money that were equivalent to all or part of the principal invested by those investors.   The payment of these funds to investors and the payment of commissions to the Defendants were an integral part of the fraudulent scheme perpetrated by the Insiders.

109.   For investors who did not request distributions, interest amounts were "credited" to the investors' purported accounts with the EquiAlt Entities.  These fictitious profits were likewise unsupported by the EquiAlt Entities' investment performance and only served to further increase the EquiAlt Entities' insolvency.

110.   These (and all other) transfers that the Insiders caused the EquiAlt Entities to make to investors were paid from the fruits of the scheme. Specifically, they were largely paid from: (1) principal investment money from new investors; (2) existing investors' principal investment money; and (3) additional principal investment money from existing investors.

111.   These distributions were not distributions of earned revenues or of the investors' principal investments.   Indeed, the ventures were not profitable. Distributions, withdrawals and redemptions were dependent on newly invested funds.

112.   Because the "account statements" and investor website did not reflect the true nature of the Insiders' and the EquiAlt Entities' activities, by intentionally and wrongfully causing the EquiAlt Entities to pay those amounts to investors, the Insiders improperly diverted assets of the EquiAlt Entities to perpetuate the scheme.

113.   The investors relied upon the fictitious interest and growth purportedly achieved by the Insiders and the purported payment of principal

redemptions upon request to make additional investments with the Insiders and the EquiAlt Entities.

114.   Defendant Sales Agents requested investors to refer friends, family, and business colleagues to invest in the fraudulent scheme.

115.   The principal investment money from new investors, the existing investors' principal investment money, and the existing investors' additional principal investment money should have been used for the stated purpose of the EquiAlt Entities' business, which was to purportedly conduct and manage the business of legitimate real estate investment funds.

116.   The EquiAlt Entities were harmed by this unauthorized course of conduct, which was effectuated by the Insiders through the EquiAlt Entities in furtherance of the scheme.  This conduct dissipated assets of the EquiAlt Entities.

117.   The negative cash flow of the EquiAlt Entities made the eventual collapse of the scheme inevitable.

C.   **Transfers to the Defendants**

118.   The Defendants were sales agents whose sales activities helped perpetrate the EquiAlt scheme by selling the unregistered securities to unwitting and often elderly investors. The Defendants received commissions, usually 6% of the invested amount, for their part in this fraudulent scheme. Subsequent payments of commissions and overrides were made by the

30

Defendants and to the extend those subsequent payments were received by the Individual Defendants, are included in the monies sought herein.

119.   Specifically, as detailed in Exhibit 1 attached hereto and incorporated herein, based on the records reviewed by the Receiver as of the filing of this complaint, between 2013 and 2020, the Insiders caused one or more of the EquiAlt Entities to pay, through BRSS, undisclosed commissions to each Defendant.  These transfers are itemized in Exhibit 1, which details the date and amount of each such transfer and the bank account from which the transfer was paid.

120.   To the extent the Individual Defendants sold the debentures, that person's commission would in some instances be paid to the Corporate Defendant associated with that Individual Defendant. The Corporate Defendant would then pay commissions to that Individual Defendant.

121.   Additionally, the Defendants in turn had sales people working below them to sell the EquiAlt products. When commissions were received by the Corporate Defendants as noted in Exhibit 1, the Individual Defendants would take or retain an override for those transactions initiated by these other sales people.

122. Each Defendant's commissions, finder's fees, overrides or otherwise avoidable transfers (whatever the final amount is determined to be

following discovery) are the amounts the Receiver seeks to recover in this suit.

123.   To allow the Defendants to keep these fraudulent transfers would be inequitable and unjust, including to the investors in the EquiAlt Entities as a whole.

124.   All money the Insiders wrongfully caused the EquiAlt Entities to transfer or pay to the Defendants was diverted and misappropriated by the Insiders in furtherance of the scheme.   Thus, all the monies transferred or paid to the Defendants were improperly diverted assets of one or more of the EquiAlt Entities. These payments to Defendants were a necessary and important part of the Insiders' scheme and allowed them to create the façade that EquiAlt was a bona fide investment business.

## COUNT I
### Florida Statutes § 726: Uniform Fraudulent Transfer Act

125.   The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 117.

126.   Because the Insiders intentionally and wrongfully caused the transfer to the Defendants of investors' commingled principal investment money in an amount equivalent to each Defendant's commissions from one or more of the EquiAlt Entities as identified in Exhibit 1 under the circumstances alleged in this complaint (or subsequent transfers of override

32

and/or commission payments to the Individual Defendants), the EquiAlt Entities, through the Receiver, have a right to repayment of at least that amount from each Defendant.

127.   In light of this right to repayment (and independently because the Insiders' conduct alleged in this complaint with respect to the EquiAlt Entities amounted to embezzlement, breach of fiduciary duty, breach of contract, fraud, and/or other violations of law), the EquiAlt Entities have a claim against the Insiders and consequently are creditors of the Insiders under FUFTA.  Accordingly, the Insiders are debtors under that act.

128.   The transfers of commissions that the Insiders caused the EquiAlt Entities to make to each Defendant were inherently fraudulent because the transfers were made as part of the scheme.

129.   Those transfers were fraudulent under Florida Statutes § 726.105(1)(a) because the Insiders caused EquiAlt Entities to make the transfers with actual intent to hinder, delay, or defraud creditors of the Insiders and/or the EquiAlt Entities.

130.   Those transfers also were fraudulent under Florida Statutes § 726.105(1)(b) because: (a) the Insiders caused EquiAlt Entities to make those transfers; and (b)(i) the Insiders and the EquiAlt Entities were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or

33

transaction; or (ii) the Insiders intended that they and/or the EquiAlt Entities incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

131.   Those transfers also were fraudulent under Florida Statutes § 726.106(1) because neither the Insiders nor the EquiAlt Entities received a reasonably equivalent value in exchange for those transfers to each Defendant, and the Insiders and the EquiAlt Entities were insolvent at all relevant times.

132.   On behalf of the EquiAlt Entities from which money was transferred to each Defendant as identified in Exhibit 1, or received through subsequent transfers, the Receiver is entitled to avoid and recover transfers equal to the amount of commission that the Insiders caused those EquiAlt Entities to make to each Defendant as well as subsequent transfers made to the Individual Defendants (and to any other pertinent remedy, including those available under Florida Statutes § 726.108).

133.   On behalf of the other EquiAlt Entities, the Receiver is entitled to avoid and recover those transfers because (i) money was commingled among the EquiAlt Entities and (ii) the Insiders used the EquiAlt Entities as a single, continuous scheme.

WHEREFORE, the Receiver asks this Court to enter judgment against each Defendant avoiding transfers from the EquiAlt Entities in the amount of

each Defendant's commissions and subsequent transfers, including overrides and commissions, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT II
### Unjust Enrichment

134.   The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 117.

135.   This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

136.   Each Defendant received a benefit when during the course of the scheme, the Insiders wrongfully caused EquiAlt Entities to transfer money to each Defendant in an amount equal to each Defendant's commissions and overrides.

137.   Each Defendant knowingly and voluntarily accepted and retained a benefit in the form of those commissions and overrides to which they were not entitled.

138.   The circumstances alleged in this complaint render each Defendant's retention of that benefit inequitable and unjust, including to the investors of the EquiAlt Entities as a whole, so each Defendant must pay the

Receiver, acting on behalf of the EquiAlt Entities, the value of the benefit received.

139.   Each Defendant has been unjustly enriched at the expense of the EquiAlt Entities (and, ultimately, their investors) in the amount of each Defendant's commissions, and the EquiAlt Entities, through the Receiver, are entitled to judgments in the amount of those commissions and overrides.

140.   The Receiver, on behalf of the EquiAlt Entities, is entitled to the return of that money through disgorgement or any other applicable remedy.

WHEREFORE, the Receiver asks this Court to enter judgment against each Defendant in the amount of each Defendant's commissions and overrides, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

Dated: August 2, 2021

Respectfully submitted,

Katherine C. Donlon, FBN 0066941
kdonlon@jclaw.com
JOHNSON, CASSIDY, NEWLON &
DeCORT, P.A.
2802 N. Howard Avenue
Tampa, FL 33067
Tel: (813) 291-3300
Fax: (813) 324-4629

36

and

Jared J. Perez, FBN 0085192
jperez@guerraking.com
R. Max McKinley, FBN 119556
mmckinley@guerraking.com
GUERRA KING P.A.
5505 West Gray Street
Tampa, FL 33609
Tel: (813) 347-5100
Fax: (813) 347-5198

*Attorneys for the Receiver*
*Burton W. Wiand*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 2, 2021, I electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send notification of electronic filing to all counsel of record.

I HEREBY FURTHER CERTIFY that on August 2, 2021, I will cause a copy of the foregoing to be sent via US Mail to all Non-CM/ECF participants listed on the following Service List.

_____
Katherine C. Donlon, FBN 0066941

## SERVICE LIST
### *Burton Wiand v. Family Tree Estate Planning, LLC, et al.*
### *Case No.: 8:21-cv-00361-SDM-AAS*

Seek Insurance Services, LLC
c/o James Gray
13702 W Chaparosa Way
Peoria AZ 85383

James Gray
13702 W Chaparosa Way
Peoria AZ 85383

Patrick Runninger
3961 E. Chandler Blvd., #111-369
Phoenix, AZ 85048

The Financial Group, LLC
c/o Patrick Runninger
3961 E. Chandler Blvd., #111-369
Phoenix, AZ 85048

Rokay Unlimited, LLC
c/o Anthony Spooner
829 St. James Lane
St. George, Utah 84790

Anthony Spooner
829 St. James Lane
St. George, Utah 84790

MASears LLC d/b/a Picasso Group
c/o United States Corporation Agents, Inc.
500 N Rainbow Road, Ste 300A
Las Vegas, NV 89107

DeAndre Sears
9400 Angelfish Drive
Las Vegas, NV 89117