## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BURTON WIAND, as Receiver for
EquiAlt LLC, EquiAlt Fund, LLC,
Fund II, LLC, EquiAlt Fund III, EA
SIP, LLC, EquiAlt Secured Income
Portfolio REIT,

      Plaintiff,                    Case No.: 8:21-cv-00361-SDM-AAS

v.

FAMILY TREE ESTATE PLANNING,
LLC, et al.,

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ROBERT ARMIJO AND JOSEPH FINANCIAL

Plaintiff Burton W. Wiand ("**Receiver**"), as Receiver for EquiAlt Fund, LLC ("Fund I"); EquiAlt Fund II, LLC ("Fund II"); EquiAlt Fund III ("Fund III"); EA SIP, LLC ("EA SIP") (collectively the "Funds"); EquiAlt Secured Income Portfolio REIT (the "REIT"); and EquiAlt LLC (collectively, the "EquiAlt Entities"), moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on **Count I** of the amended complaint ("Amended Complaint") [DE 81]. Count I seeks recovery under the Florida Uniform Fraudulent Transfer Act, Fla. Stats. §§ 726.101 et seq. ("FUFTA")

(specifically, under Fla. Stats. §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1)), for $1,472,458.35 (plus prejudgment interest) transferred from one or more of the EquiAlt Entities to Defendants, Joseph Financial Inc. and/or Robert Armijo ("Armijo") (collectively *"Defendants"*).

## I.   INTRODUCTION

From 2011 through December 2019, Brian Davison ("Davison") and Barry Rybicki ("Rybicki") (collectively "the Insiders") raised over $168 million in 1686 distinct transactions on behalf of one or more of the EquiAlt Entities through the offer and sale of securities, in this case, debentures of the Funds and REIT shares ("EquiAlt Securities"), in the EquiAlt real estate development scheme, as part of a single, continuous Ponzi scheme (the "Scheme").

The sale of securities in this case involved a Ponzi scheme because the revenues generated by the Funds and the REIT from inception through December 2019 were insufficient to pay the monthly aggregate returns to investors who were sold EquiAlt Securities. The Insiders, who operated the Funds and the REIT, caused the Funds and the REIT to use new investor funds to make so-called interest and/or principal payments to earlier investors.

The Receiver brought this action against thirty-six (36) entities and individuals—including Defendants—who sold or marketed EquiAlt Securities and received commissions, fees, or other monies of $18,795,000.03.  In this motion, the Receiver seeks summary judgment against Defendants to recover

commissions received from the EquiAlt Entities, directly or indirectly, in furtherance of the Scheme ("Fraudulent Transfers") in the amount of $1,472,458.35 and prejudgment interest in the amount of $392,388.96 through July 31, 2022, and ongoing through payment.  By selling the EquiAlt Securities, the Defendants substantially assisted the Insiders in the perpetration of their fraud.

## II.   STATEMENT OF MATERIAL FACTS

1.    The Insiders operated the EquiAlt Entities as a Ponzi scheme from inception, and during that time the EquiAlt Entities were insolvent. *See* Declaration of Maria M. Yip, attaching her Expert Report (hereinafter "Yip Report") at ¶¶ 9, 29, 39, attached as Exhibit 1.

2.    The Insiders' Ponzi scheme was premised on selling the EquiAlt Securities to investors for the purchase of real properties by the Funds and the REIT.  *See* Declaration of Burton W. Wiand ¶ 9, attached as Exhibit 2.

3.    From September 2011 through December 2019, the EquiAlt Entities sold debentures to investors in Fund I. *See* Yip Report at ¶24.  From May 2013 through December 2019, the EquiAlt Entities sold debentures to investors in Fund II. *Id.* at ¶25. From July 13, 2013 through December 2015, the EquiAlt Entities sold debentures to investors in Fund III. *Id.* at ¶26. From April 2016 through December 2019, the EquiAlt Entities sold debentures to investors in EA SIP. *Id.* at ¶27.

4.     From inception through December 2019, without exception, the monthly aggregate revenues of the Funds and the REIT were insufficient to pay the monthly aggregate returns to investors. *Id.* ¶ 29.

5.     The Funds and the REIT were an integrated Ponzi scheme and the funds and assets of the Funds were comingled. *See* Declaration of Phil Feigin. at p. 19, attached as Exhibit 3; Yip Report ¶¶ 19-39.

6.     According to the private placement memoranda for the Funds, EquiAlt was to invest 90-95% of the monies invested in real property. This was false. *See* Feigin Decl. at p. 27; Wiand Decl. ¶¶ 11, 18.

7.     Sales commissions of 6-12% of the investment transaction were paid to the sales agent responsible for the sale of that investment. *See* Yip Report at ¶53.d. Armijo received a 10% commission on investments he sold and an additional 2% bonus if he raised $500,000 during a month. *See* Testimony of Robert Armijo (11/12/20) ("Armijo Testimony") at 46, attached as Exhibit 4.

8.     PPMs for the investments did not accurately and fully disclose the amount of commissions being paid to unregistered sales agents. *See* Wiand Decl. ¶ 12.

9.     Investors were to receive between 8-12% annual return paid monthly on their debenture investments, depending upon in which Fund they invested. *See* Feigin Decl. at p.7; Wiand Decl. ¶ 13.

10.   The EquiAlt Securities were unregistered securities sold in violation of Section 5 of the Securities Act as they were not registered with the SEC nor were they exempt from registration under the provisions of the Act nor regulations promulgate thereunder including Regulation D. *See* Feigin Decl. at pp.5-6, 17-20.

11.   The EquiAlt Entities used unlicensed sales agents, including Defendants,  to sell the EquiAlt Securities to investors. *See* Feigin Decl. at p. 6; Yip Report ¶¶ 55, 56.

12.   To the extent that the sales agent was not licensed to sell securities by the SEC or any state securities authority, that sales agent was selling the EquiAlt Securities as an unregistered broker. *See* Feigin Decl. at pp. 6, 20-22.

13.   The Insiders, through Rybicki's company BR Support Services, LLC ("BR Support"), an Arizona limited liability company, handled the payment of sales commissions to the unregistered sales agents involved in the marketing and sale of the Equialt Debentures. *See* Yip Report ¶48; Wiand Decl. at ¶ 14.

14.   Rybicki submitted check request forms to Fund I, Fund II and EA SIP which detailed the requested commission amount, the name of the investor, as well as the corresponding investment amount. *See* Yip Report ¶50.

15.   Davison would approve the check request and the Fund at issue would send the commission payment to BR Support. *See* Wiand Decl. ¶ 15.

5

16. Commissions for the REIT were paid directly by other EquiAlt Entities to the sales agents, including Defendants. *See* Yip Report ¶ 50, n.11 and Exh. 15 thereto.

17. Once BR Support was in receipt of the funds, BR Support paid sales agents, including the Defendants, sales commissions ranging between 6% and 12% of the investment amount of the securities they sold. *Id.*

**Commissions and Fees Received by Armijo**

18. Defendants raised over $10 million in connection with the EquiAlt Ponzi scheme. *See* Yip Report ¶9.b.

19. Armijo directed that all commissions for his sale efforts be delivered to Joseph Financial. *See* Armijo testimony at pp. 34-35. Commissions in the amount of $1,472,458.35 were received by Joseph Financial for Armijo's sale of EquiAlt Securities. *See* Armijo's Responses to First Request for Admission ("Armijo's Responses"), #65, attached as Exhibit 5.

**Material Facts Related to Robert Armijo**

20. Armijo is the principal and sole owner of Defendant Joseph Financial. *See* Armijo's Responses, #1; Armijo testimony at 13.

21. Armijo did not have a Series 7 license during the time he sold EquiAlt debentures and REIT shares. *See* Armijo's Responses, #2.

22. Armijo was not licensed by any self-regulatory agency or the SEC to sell securities during the time period 2016 to 2020. *See* Armijo's Responses,

##8-9. The only license Armijo held was a Series 65. *See* Armijo's Responses, #3.

23.     A Series 65 license does not allow persons, including Armijo, to sell securities. *See* Feigin Decl. at pp. 22-23. From 2016 until the present, Armijo has never been an associated person of a licensed brokerage firm. *See* Armijo's Responses, #23.

24.     The debentures and REIT shares sold to investors, including those sold by Armijo, were securities. *See* Armijo's Responses, ##13, 42, 43; Feigin Decl. at pp. 5-6, 19-20.

25.     It is illegal to sell securities without a license from a state or being registered with FINRA. *See* Armijo's Responses, #22; Feigin Decl. at p. 6.

26.     The compensation Defendants received in connection with the EquiAlt investments of his clients was a percentage of the amount of the investment and based on the amount of the investment transaction. *See* Armijo's Responses, ##18-19; Armijo testimony at pp. 45-46.

27.     Armijo never told any client that he was not licensed to sell securities. *See* Armijo's Responses, #21.

28.     Armijo never told any investor or client that EquiAlt and its funds were insolvent. *See* Armijo's Responses, #35.

29.     According to the Form ADV filed by Joseph Financial Investment Advisors, Joseph Financial used fundamental analysis to analyze securities:

<u>Fundamental</u> – This is a method of evaluating a security by attempting to measure its intrinsic value by examining related economic, financial and other qualitative and quantitative factors. Fundamental analysts attempt to study everything that can affect the security's value, including macroeconomic factors (like the overall economy and industry conditions) and individually specific factors (like the financial condition and management of a company). The end goal of performing fundamental analysis is to produce a value that an investor can compare with the security's current price in hopes of figuring out what sort of position to take with that security (underpriced = buy, overpriced = sell or short). Fundamental analysis is considered to be the opposite of technical analysis. Fundamental analysis is about using real data to evaluate a security's value. Although most analysts use fundamental analysis to value stocks, this method of valuation can be used for just about any type of security.

*See* Armijo Testimony at Ex. 94.

30.     Armijo did not conduct required due diligence or "fundamental analysis" in connection with his sale or recommendation of EquiAlt Securities to customers because other than the REIT, there were no audited financials to review for the funds. *See* Wiand Decl. ¶¶ 16, 17.

31.     Through his unlawful sales of EquiAlt securities to his customers, Armijo substantially assisted the Insiders by raising over $10,000,000 for the EquiAlt Ponzi scheme.  *See* Yip Report ¶ 55.

32.     Armijo's sales of EquiAlt securities to his customers increased the insolvency of the EquiAlt funds and provided no benefit to the EquiAlt Entities or their investors. *See* Wiand Decl. ¶ 19.

33.     Armijo had actual knowledge of material misstatements in the Fund private placement memoranda ("PPM"). Further reliance on the PPM in the sales of the EquiAlt Securities was at the very least reckless. *See* Feigin Decl. at p. 27.

34.     Before the Receiver brought this action against Armijo, he was named as a defendant/respondent in two proceedings alleging liability on his part based on the sale of securities by an individual who had a Series 65 license (investment advisor) and was not licensed as a broker-dealer.  Armijo has also been sued previously for selling unregistered securities.  *See* Armijo Testimony at pp. 15-17; Armijo's Responses, ##58, 59.

**Receivership Authority**

35.     On February 14, 2020, the Receiver was appointed by the Court presiding over *Securities and Exchange Commission v. Brian Davison, et al.*, Case No. 8:20-cv-325-T-MSS-AEP (M.D. Fla.) (the "Receivership Case"), as the Receiver for the Corporate Defendants and the Relief Defendants (the "Order Appointing Receiver") (Doc. 11 in Receivership Case). *See* Wiand Decl. ¶ 3.

36.     On August 17, 2020, the Court in the Receivership Case expanded the receivership to include EquiAlt Qualified Opportunity Zone Fund, LP, EquiAlt QOZ Fund GP, LLC, EquiAlt Secured Income Portfolio REIT, Inc., EquiAlt Holdings LLC,  EquiAlt Property Management LLC, and EquiAlt Capital Advisors, LLC (Doc. 184 at p. 6 in Receivership Case). *See* Wiand Decl. ¶ 4.

37.     Pursuant to the Order Appointing Receiver, the Receiver was given broad powers to investigate the affairs of the EquiAlt Scheme and pursue

9

claims against persons who may have liability to the Receivership. *See* Wiand Decl. ¶ 6.

38.     In granting the SEC's Motion for Preliminary Injunction (Doc. 184 in Receivership Action), the Court in the Receivership Action found:

> a.  [T]he evidence shows that the Defendants most likely operated as a Ponzi scheme using new investor funds to pay old investor obligations while simultaneously siphoning funds for their own benefit far and above any amount that anyone might reasonably believe was disclosed to investors.
>
> b.  [T]he Court finds that the Commission has demonstrated a substantial likelihood of proving that it will prevail on its Section 5 and Section 10(b) registration claims.

*See* Wiand Decl. ¶ 8.

**<u>Outstanding Obligations of EquiAlt Funds</u>**

39.     At the time the Receiver took over control of the EquiAlt Funds on February 14, 2020, the Funds, including the REIT, had debenture principal outstanding to investors of $178,337.208. *See* Yip Report at ¶41.

40.     The accrued interest on the debenture principal outstanding, from the Receivership Date through the earlier of (a) the debenture expiration date or (b) July 31, 2022, is $25,040.144. *See* Yip Report at ¶42.

41.     The accrued interest on the expired debentures, from the later of (a) Receivership Date or (b) debenture expiration date and ending to July 31, 2022, is $6,892,866. *See* Yip Report at ¶43.

42.     While the Receivership has collected $66 million, to date, there is no likelihood that the Receivership will collect the $210 million necessary to pay the outstanding debenture obligations and interest. *See* Wiand Decl. ¶ 20.

### III.   LEGAL ARGUMENT

### A.   The Standard for Granting Summary Judgment

Summary judgment is proper where no genuine issues of material fact exist and the moving party is entitled to summary judgment as a matter of law. *Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1232 (11th Cir. 2002). The movant has "the initial responsibility of informing the district court of the basis for [his] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [he] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

This motion addresses the Receiver's entitlement to summary judgment on his claims in Count I for the avoidance of fraudulent transfers under §§ 726.105(1)(a) and (b) and 726.106(1), as well as his entitlement to summary judgment on Defendants' affirmative defenses.  Because the transfers of commissions made to Defendants came from the Funds and the REIT, entities

used by the Insiders to perpetrate the Scheme, the transfers were made with actual fraudulent intent without the need to consider badges of fraud. *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014). There is no genuine issue of material fact that the Receiver is entitled to avoid these transfers to Defendants as a matter of law pursuant to *Florida Statutes* §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1), subject to Defendants' affirmative defenses.

Defendants have asserted various affirmative defenses. All of those affirmative defenses fail either because the asserted defenses are not actually defenses to the Receiver's claims or the defenses are factually and/or legally unfounded. Defenses 2, 5, 6, 10, and 11 are not affirmative defenses to the Receiver's claims. Defenses 3, 4, 7, 8, 9, and 12 through 16 are factually and/or legally unfounded.

With respect to Defendants' affirmative defenses, it is not the Receiver's burden to produce evidence negating the existence of material fact; rather, it is his responsibility to merely "point out the absence of evidence supporting the nonmoving party's case." *Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc.*, 401 F.Supp.2d 1270, 1274 (S.D. Fla. 2003). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. at 323.

With respect to Defendants' affirmative defenses, the Receiver, as the moving party, "must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial," which the Receiver has done.  *U.S. v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 n. 19 (11th Cir. 1991).  Therefore, in response to this motion, Defendants cannot rely merely on the allegations contained in their affirmative defenses to satisfy their burden and escape summary judgment.  Rather, Defendants must designate actual evidence, with depositions, answers to interrogatories, and/or through admissions, and must demonstrate there is an actual issue for trial.  *Witbeck v. Embry Riddle Aeronautical Univ., Inc.*, 219 F.R.D. 540, 542 (M.D. Fla. 2004) (citing *Celotex*, 477 U.S. at 324).

**B.    The Receiver Has Proven His Case for Avoiding Transfers to Defendants Under the Actual Fraud and Constructive Fraud Provisions of the Florida Uniform Fraudulent Transfer Act**

> **1.    Elements of Proof for Fraudulent Transfer Under *Fla.Stat.* § 726.105(1)(a)**

The Receiver has made claims for violations of three separate provisions of FUFTA in Count I of his amended complaint.  The first claim is for violation of the actual fraud provision of FUFTA, § 726.105(1)(a).  To prove this claim, the Receiver must demonstrate "'[1] a creditor to be defrauded, [2] a debtor intending fraud, and [3] and a conveyance of property which is applicable by

13

law to the payment of the debt due.'" *Wiand v. Lee*, 753 F.3d at 1199-1200

(citing *Johnson v. Dowell*, 592 So.2d 1194, 1196 (Fla. 2d DCA 1992))

### a.    The Receiver is a creditor of the Insiders

Section 726.102(4), *Fla.Stat.*, defines a creditor as "a person who has a

claim", and § 726.102(3) defines "Claim" as "a right to payment, whether or not

the right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured."   In the context of a Ponzi scheme, a corporation used by the

operator-debtor for the execution of the Ponzi scheme is a creditor of the

operator-debtor because the Ponzi scheme harms the corporation when assets

are transferred for an unauthorized purpose.  *See Wiand v. Lee*, 753 F.3d at

1202.  Here, the Funds and the REIT became creditors of the Insiders when

they made or orchestrated transfers of illegal commissions to Armijo and other

sales agents because those transfers gave the entities a claim against the

Insiders. *Id.* at 1202-03.  It is without question that the transfers to the sales

agents were made in the furtherance of the Scheme as it could not have

succeeded without the payments to induce the sales agents to make their

unlawful sales.

On February 14, 2020, the Court in the Receivership Action entered its

order appointing Wiand as the receiver for the EquiAlt Entities and Relief

Defendants.  *See* Wiand Decl. ¶ 3.  That order removed the Insiders from any

control over the EquiAlt Entities and Relief Defendants and directed Wiand to take immediate possession of all property, assets and estates of every kind of the EquiAlt Entities and the Relief Defendants; to institute proceedings against any person or entity that may have wrongfully, illegally, or otherwise improperly misappropriated or transferred any money or other proceeds traceable from investors; and to take control over the assets and operations of the EquiAlt Entities and the Relief Defendants. *See* Wiand Decl. ¶¶ 5, 6.

With the appointment of Wiand as receiver and the removal of the Insiders from control over and operation of the EquiAlt Entities and the Relief Defendants, "the receivership entities [were] no more the 'evil zombies' of the Ponzi operator but [were] '[f]reed from [their] spell' and bec[a]me entitled to the return of the money diverted for unauthorized purposes." *Id.* at 1202. (citing *Scholes v. Lehman*, 56 F.3d 750, 754 (7th Cir. 1995)) Therefore, the Receiver, standing in the shoes of the Funds and the REIT, is a creditor of the Insiders for the transfers that they made or orchestrated in perpetuating the Ponzi scheme. *Wiand v. Lee*, 753 F.3d at 1202.

### b. The existence of a Ponzi scheme proves actual intent to defraud under § 726.105(1)(a), *Fla.Stat.*

Under Eleventh Circuit law, "proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under Fla.Stat. § 726.105(1)(a) without the need to consider the badges of fraud."

*Wiand v. Lee*, 753 F.3d at 1201.  *See also Wiand v. Dewane*, 2012 WL 750523 at *2 (M.D. Fla. Feb. 7, 2012) ("What the statute [*Fla.Stat.* § 726.105(1)(a) does require Wiand to show is that the debtor made the transfer with requisite intent to hinder, delay or defraud, a fact that Wiand can establish by proving the underlying scheme.").  "To prove a ponzi scheme, the Receiver must establish:  (1) deposits made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors."  *Wiand v. Morgan*, 919 F.Supp.2d 1342, 1355 (M.D. Fla. 2013) (citing *Wiand v. Waxenberg*, 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009)).

From September 2011 through December 2019, the Funds, beginning with Fund I, and the REIT, while they were under the control of the Insiders, raised approximately $178,000,000 in approximately 1686 distinct transactions involving more than 1100 investors.  *See* Wiand Decl. ¶ 21.  The purported source of funds for the Funds and the REIT to pay investors was rental income from real estate.  *See* Wiand Decl. ¶ 10.  Maria Yip, an experienced forensic accountant, performed various analyses of the financial affairs of the Funds and the REIT, which establish that the Insiders and the EquiAlt Entities operated a Ponzi scheme.  Based on Yip's monthly cash flow

16

analyses for each of the Funds, she concluded that the "monthly aggregate revenues from the Funds and the REIT were insufficient to pay the monthly aggregate returns to investors, from inception through December 2019, without exception." *See* Yip Report ¶¶ 19-29.  Yip determined through tracing of funds analyses that new investor funds had been utilized to make interest and/or principal payments to existing investors as is typical in a Ponzi scheme. *See* Yip Report ¶¶ 30-39.  Yip also concluded that "EquiAlt Fund, LLC, EquiAlt Fund II, LLC, EquiAlt Fund III, LLC, EAP SIP, LLC, and REIT operated as a Ponzi scheme since inception . . .."  *See* Yip Report ¶¶ 9, 39.

Because it is undisputed that the Insiders and the EquiAlt Entities operated the Funds and the REIT as a Ponzi scheme since their inception, the Receiver is entitled to rely on the Ponzi scheme presumption to prove that the Insiders caused the Funds and the REIT to transfer funds to Defendants as commission payments, with the actual intent to defraud under § 726.105(1)(a), *Fla.Stat.*, without the need to consider any badges of fraud.  *Wiand v. Lee*, 753 F.3d at 1201.

### c.    The Insiders caused the Funds and the REIT to transfer commission payments to Defendants

In her report, Yip has detailed the commission payments that the Insiders caused the Funds and the REIT to make to Defendants and other sales agents.  *See* Yip Report ¶¶ 47-67.  Defendants received $1,472,458.35  in

17

commission payments.  *See* Armijo's Responses # 65.  They received those commission payments either directly from the Funds and REIT or indirectly through Rybicki's company, BR Support.  *See* Yip Report ¶¶ 17, 47-53. Defendants raised at least $10,164,919 from investors for the Funds and REIT between February 2016 and February 2020.  *See* Yip Report ¶ 55.  The commission payments made to Defendants and other sales agents, orchestrated by the Insiders, created a debtor-creditor relationship between the Insiders and the Funds and the REIT.  The commission payments were made in furtherance of a Ponzi scheme, clearly an unauthorized purpose.

### 2. Elements of Proof for Fraudulent Transfer Under §§ 726.105(1)(b) and 726.106(1)

Sections 726.105(1)(b) and 726.106(1) set forth the constructive fraud provisions of FUFTA.  Under § 726.105(1)(b), to prove a transfer is fraudulent, the Receiver must establish he did not receive reasonably equivalent value and one of two factual showings of the insolvency of the EquiAlt Entities at the time of the transfers.

Under § 726.106(1), to prove a transfer is fraudulent, the Receiver must establish he did not receive reasonably equivalent value and the insolvency of the EquiAlt Entities at the time of the transfers.

### a. The Funds did not receive reasonably equivalent value in exchange for the commission payments

Undoubtedly, Defendants will argue in opposition to this motion that they provided reasonably equivalent value in return for the commission payments they received.  Defendants will likely claim that the Funds and the Insiders received exactly what they were looking for in exchange for the commission payments, the investment of new funds by investors to purchase debentures issued by the Funds.  Any such argument made by Defendants should be rejected because Defendants were unlicensed to sell securities to any investor and the EquiAlt Securities were unregistered securities.  *See* Armijo's Responses ## 2-9, 13, 23, 42, 43; Feigin Decl. at pp. 5-6.  Sales of securities by unlicensed persons are illegal, and contracts for the sale of securities by unlicensed persons are void.  *See* 15 U.S.C. § 78(o)(a)(1) and 15 U.S.C. § 78cc(b); Feigin Decl. at pp. 6, 20-22.  Likewise, sales of unregistered securities are illegal.  *See* 15 U.S.C. § 77e(a) and (c); Feigin Decl. at pp. 6, 17-20.

A number of courts have held that illegal consideration does not constitute reasonably equivalent value and that where a contract is illegal or unenforceable, the contract does not constitute reasonably equivalent value. *See Wing v. Dockstader*,  482 Fed. Appx. 361, 365 (10th Cir. 2012); *Klein v. Stewart*, 2021 WL 5203149 at *10 (D. Utah Nov. 9, 2021); *Ruffini v. Norton Law Group PLLC (In re Ruffini)*, 2014 WL 714732 at *9 (Bankr. E.D. N.Y. Feb. 25, 2014); *Armstrong v. Collins*, 2010 WL 1141158 at *30 (S.D. N.Y. March 24, 2010).

19

Because the EquiAlt Securities were unregistered and because they were sold by unlicensed persons, the sales were illegal and void and subject to rescission. The sales of EquiAlt Securities by Defendants, all of which are subject to rescission, cannot constitute reasonably equivalent value.

In addition, because Ponzi schemes are by definition insolvent, they become more insolvent with each payment of funds to investors, sales agents, or others. The payments of commissions to Defendants and other sales agents served only to increase the insolvency of the Scheme and to harm and defraud creditors, including the EquiAlt Entities.

### b. The Ponzi scheme was insolvent from inception and the EquiAlt Entities were insolvent

In *Wiand v. Lee*, the court recognized that Ponzi schemes are insolvent from their inception. The court stated:

> The magistrate judge concluded, and the parties do not challenge, that Nadel operated the receivership entities as a Ponzi scheme. A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be high returns, but which are in reality a return of their own principal or that of other investors. *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325, 1327 n. 1 (11th Cir. 2002). The entities used to perpetuate the scheme usually conduct little to no legitimate business operations. *Id.* Since Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment. *See id.* at 1332 ("By definition, a Ponzi scheme is driven further into

insolvency with each transaction.") (quoting *In re Universal Clearinghouse*, 60 B.R. 985, 999 (D. Utah 1986)).

753 F.3d at 1201. *See also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) ([A] Ponzi scheme . . . is, as a matter of law, insolvent from its inception.).

Thus, according to the pronouncements of the Court in *Lee*, when the Insiders orchestrated payments of commissions from the EquiAlt Entities to Defendants and other sales agents, they were having the entities engage in business or transactions for which the remaining assets were unreasonably small in relation to the business or transactions; the Insiders were incurring on behalf of the EquiAlt Entities and reasonably should have believed that the entities would incur and were incurring debts beyond their ability to pay them as they became due; and clearly, the EquiAlt Entities were insolvent when the commission transfers were made and became more insolvent as a result of those transfers. *See* Yip Decl. ¶¶ 19-29, 39.

## 3. There are No Genuine Issues of Material Fact, and the Receiver is Entitled to Judgment as a Matter of Law

Based on the foregoing, there are no genuine issues of material fact regarding the Receiver's entitlement to summary judgment on his fraudulent transfer claims, both actual and constructive, as alleged in Count I of the Amended Complaint, subject to Defendants' affirmative defenses. As

demonstrated below, all of Defendants' affirmative defenses fail, entitling the Receiver to judgment.

**C.    Defendants' Affirmative Defenses Numbered 2, 5, 6, 10, and 11 are Not Affirmative Defenses to the Receiver's Fraudulent Transfer Claims**

In affirmative defense number 2, Defendants assert that the Receiver lacks standing to bring his claims because he already has assets sufficient to pay all EquiAlt creditors and investors.  Whether the Receiver has sufficient assets to pay the EquiAlt creditors and investors does not affect the ability of the Receiver to prevail on his claims against Defendants for their receipt of fraudulent transfers orchestrated by the Insiders.  As demonstrated above, the record before the Court establishes that the Receiver is entitled to prevail on his actual and constructive fraudulent transfer claims against Defendants. Nevertheless, the Receiver does not have sufficient assets in the Receivership estate to pay the $210,270,218 of principal and interest owed to the investors, much less sufficient assets to pay that amount and the ongoing expenses of the Receivership.  *See* Yip Report ¶¶ 40-46; Wiand Decl. ¶ 20.  Thus, affirmative defense number 2 asserted by Defendants is without merit.

In affirmative defense number 5, Defendants assert that any judgment must be limited to the value of the assets transferred or the amounts necessary to satisfy individual claims, whichever is less.  Defendants do not identify the "individual claims" to which this defense refers.  Under applicable precedent,

the Receiver is entitled to judgment against Defendants for the total amount of the fraudulent transfers they received plus prejudgment interest. *See Wiand v. Dancing $, LLC*, 578 Fed. Appx. 938, 942, 946 (11th Cir. 2014); *Wiand v. Lee*, 753 F.3d at 1198, 1204; *Cuthill v. Kime (In re Evergreen Security, Ltd.)*, 319 B.R. 245, 250, 256 (Bankr. M.D. Fla. 2003); *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.*), 275 B.R. 641, 645, 663 (Bankr. M.D. Fla. 2002).

In Defendants' affirmative defense number 6, Defendants assert that they are entitled to remedies and offsets for any value that they gave in exchange for the alleged transfers. There is no such affirmative defense under Chapter 726. *See* 726.109, *Fla.Stat.* Section 726.109(1) provides that "[a] transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." To prove that defense, Defendants must point to evidence in the record they provided both reasonably equivalent value for the transfers and accepted the transfers in good faith. Providing value alone is simply not a defense.

In affirmative defense number 10, Defendants assert that the damages of the "investors" were caused by others, intervening, superseding or otherwise, which Defendants assert include the acts of "EquiAlt and/or EquiAlt's principals." The Receiver is not suing on behalf of the investors. He

23

is suing on behalf of the EquiAlt Entities to avoid the fraudulent transfers to Defendants. As a matter of law, the EquiAlt Entities are distinct from the EquiAlt principals, and the EquiAlt Entities have the ability to recover the fraudulent transfers orchestrated by the Insiders to Defendants. *See Wiand v. Lee*, 753 F.3d at 1205-06.

In affirmative defense number 11, Defendants assert that the Receiver is barred from recovering anything from Defendants because the U.S. Securities and Exchange Commission ("SEC") is pursuing the same recovery against Defendants for the benefit of the EquiAlt investors.  Defendants assert that the Receiver may not obtain a double recovery.  To the extent that the SEC is seeking a recovery for the benefit of EquiAlt investors, that has nothing to do with the basis for the Receiver's claims.  The SEC is seeking disgorgement and civil penalties against Defendants for their unlawful sale of unregistered securities as unregistered sales agents. The Receiver's claims are on behalf of the EquiAlt Entities which were damaged as a result of the fraudulent transfers to Defendants orchestrated by the Insiders.  Once again, the Receiver is suing on behalf of the EquiAlt Entities, not the EquiAlt investors.  The Receiver does not have the ability to assert a claim on behalf of the EquiAlt investors.  *See Isaiah v. J.P. Morgan Chase Bank*, 960 F.3d 1296, 1306 (11th Cir. 2020).

**D.    Defendants' Affirmative Defenses Numbered 3, 4, 7-10 and 12-16 are Factually and/or Legally Unfounded**

In affirmative defense number 3, Defendants assert that they did not knowingly or recklessly commit a violation of the securities laws and did not act with the requisite scienter.   However, as Mr. Feigin pointed out in his declaration, "no showing of *scienter* is required to establish a violation of either the securities registration requirement of the '33 Act §§ 5(a) and (c) or the 'broker' registration requirement of the '34 Act § 15(a)."  (Citing *Securities and Exchange Commission v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004))

In Defendants' affirmative defense number 4, they assert that they took the commissions transfers in good faith and for reasonably equivalent value or were subsequent transferees or obligees of persons who took in good faith for reasonably equivalent value.  As is discussed above, in Section III.B.2.a., as a matter of law, Defendants cannot have provided reasonably equivalent value because the services that they rendered as unlicensed brokers selling unregistered securities were illegal and any contract that they had for the payment of a commission is void and unenforceable.  *See* Feigin Decl. at pp. 5, 6, 20-22.

In addition, Defendants cannot prove that they accepted the transfers in good faith.   Courts apply an objective standard in determining whether a defendant has demonstrated good faith as part of a defense to a fraudulent

transfer claim.  *M&L Business Machine Co. v. McKay*, 84 F.3d 1330, 1335-36 (10th Cir. 1996); *Cuthill v. Kime (In re Evergreen Securities, Ltd.)*, 310 B.R. at 254; *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. at 659; *Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797-98 (Bankr. S.D. Fla. 2000).  In determining whether a defendant has proved good faith, courts examine what a transferee objectively knew or should have known.  *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. at 659.  "[I]f the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose and *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent."  *Cuthill v. Greenmark,, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. at 659 (citation omitted). In addition, "'[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.'"  *Id.* (citation omitted).  *See also Goldberg v. Chong*, 2007 WL 2028792 at *6 (S.D. Fla. July 11, 2007) ("It is only once value has been established that the Court will consider the good faith of the transferee.").

Defendants knew or reasonably should have known of the fraudulent nature of the EquiAlt Securities sales because the securities they were selling were unregistered and because they were unlicensed to sell them.  In fact, Armijo had been sued before for having sold unregistered securities and for

having sold securities without a license to do so.  *See* Armijo's Responses ## 58, 59.

Defendants' lack of good faith is also demonstrated by Armijo's misrepresentations and omissions, his knowledge he was unlicensed to sell securities, and his failure to perform any meaningful due diligence on the EquiAlt Securities before Armijo sold those unregistered securities to investors.  Armijo misrepresented the type of analysis that would be performed before the EquiAlt Securities were recommended to investors, and he misrepresented that he had reviewed financial statements of the EquiAlt Entities.  *See* Wiand Decl. ¶¶ 16, 17.  Armijo failed to disclose to investors that the EquiAlt Entities were insolvent or that he had been previously sued for selling securities without a license and for selling unregistered securities.  *See* Armijo's Responses ## 35, 58, 59, 61.  Because Armijo had been previously sued for selling unregistered securities and for selling securities without a license, he certainly knew or reasonably should have known that he could not legally sell the EquiAlt Securities.

In the context of a person recommending the purchase of securities, "[t]he law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) (citations omitted). Included in the fiduciary obligations of a broker when recommending investments are the following:  "[T]he duty to

recommend [investments] only after studying it sufficiently to become informed as to its nature, price, and financial prognosis . . . the duty to inform the customer of the risks involved in purchasing or selling a particular security . . . [and] the duty not to misrepresent any material fact to the transaction . . .." *Gochnauer*, 810 F.2d at 1049 (citation omitted).

Because Defendants recommended the EquiAlt unregistered securities to investors, Defendants owed a duty of loyalty and care to those investors. Pursuant to this duty of loyalty and care, "[t]he common law focuses on the fiduciary's responsibilities as a 'prudent man' i.e., whether the fiduciary conducted an independent investigation of the merits of a particular investment." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d at 1050 citation omitted); *see also In re: Morrow*, 1998 WL 556560 at *5 (SEC Sept. 2, 1998) ("[A] salesman may not satisfy his duty to investigate the securities he recommends by relying 'blindly' on information supplied by persons connected with the issuer."). In *Morrow*, the SEC appellate panel recognized that the duty of a securities professional to investigate an investment is particularly important when no broker-dealer is involved in the offering and there is no broker-dealer due diligence file for the broker to review. *Id.* If a broker chooses to sell such investments independently, the broker becomes responsible for conducting his own investigation of the offering. *See* Feigin Decl. at pp. 29-32.

28

Defendants will be unable to offer evidence of their performance of any meaningful investigation of the unregistered EquiAlt securities or their performance of anything that would resemble due diligence. In fact, Armijo only spoke to and relied upon the Insiders about their history in real estate, about the EquiAlt Entities' operations and business plan. *See* Armijo testimony pp. 45-47. He did not tour any of the EquiAlt rental properties. *See* Armijo testimony at p. 60. Armijo could not have reviewed any audited financial statement for EquiAlt LLC or any of the EquiAlt Funds (other than the REIT), because no audited financial statements were ever created. *See* Wiand Decl. at ¶ 17.

Courts have recognized that the due diligence that a broker under these circumstances must perform to demonstrate good faith includes investigation of the financial, performance, and personal background of investment manager or the offering company; evaluation of the risk factors and costs associated with an investment; review of any available investment ratings from financial rating services; and requesting and investigating audited financial statements of the issuer, as well as documentation from the issuer discussing its sales history and the background of key employees. *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. at 659-60. "A broker cannot rely only on slick, marketing brochures or insurance coverage, refrain from asking hard questions about the legitimacy of the product, and then assume a proper

investigation was completed." *Id.* at 660. This is especially true here where Armijo knew that representations in PPMs used by the Insiders were false.

Defendants cannot prove that they did any of those things.

Defendants are clearly not subsequent transferees or obligees of persons who took in good faith and for reasonably equivalent value. Defendants received their commission payments either from BR Support, Rybicki's company, or from the REIT. BR Support was merely a conduit for payment and it could not have taken the commission payments in good faith or for value.

Based on the foregoing, Defendants' § 726.109(1) defense is unfounded both factually and legally.

In affirmative defenses 7 and 9, Defendants assert that the Receiver's claims are barred by either the four year statute of limitations or the one year savings clause with respect to claim asserted under § 726.105(1)(a) for actual fraudulent transfers. *See* § 726.110(1), *Fla.Stat.* Defendants also assert that the Receiver's claims for fraudulent transfers prior to February 13, 2017, are barred.

It is undisputed that the Receivership Court's order appointing Wiand as receiver was entered on February 14, 2020. Wiand filed this action against Defendants and other sales agents on February 13, 2021, within one year of his appointment as receiver. *See* Wiand Decl. ¶ 7. Courts have recognized that actions asserting FUFTA actual fraud claims are timely brought if they are

commenced within one year of the date on which the receiver was appointed. *See 726.110(1); Wiand v. Meeker*, 572 Fed. Appx. 689, 692 (11th Cir. 2014); *Wiand v. Cloud*, 919 F.Supp.2d 1319, 1339 (M.D. Fla. 2013).

With respect to the Receiver's constructive fraud claims, the statute of limitations is four years from the date the transfer was made or the obligation was incurred. That statute of limitations does not "bar" the Receiver's constructive fraud claims. It merely limits them to the fraudulent transfers received by Defendants from February 14, 2017, forward.

Based on the foregoing, the Receiver's action against Defendants was timely filed and his claims are not barred by the statute of limitations.

In affirmative defense number 8, Defendants assert that the Receiver's claims are barred by fraud because he is standing in the place of the EquiAlt Insiders who allegedly committed fraudulent acts. That is factually and legally incorrect. The Receiver has filed this claim on behalf of the EquiAlt Entities. As a matter of law, the EquiAlt Entities are distinct from the Insiders for the purposes of a receiver's pursuit of FUFTA claims against third parties who received fraudulent transfers. *See Wiand v. Lee*, 753 F.3d at 1202-03.

In affirmative defenses number 12-16, Defendants assert various iterations of purported setoff defenses. However, Defendants cannot demonstrate their entitlement to setoff under Florida law against the Receiver. Under Florida law, "to avail oneself of set-off in equity, the defendant must

show an existing debt or demand against the complainant in favor of the defendant, and that the debt arose and existed under circumstances where disallowing it would be inequitable." *Wiand v. Meeker*, 2012 WL 6930504 at *18 (M.D. Fla. Dec. 13, 2012) (aff'd, in part, rev'd, in part, on separate grounds, 572 Fed. Appx. 689 (11th Cir. July 15, 2014).  In affirming that portion of the *Meeker* decision related to the setoff defense of an alleged recipient of a fraudulent transfer, the Eleventh Circuit stated:

> Setoff is the right that exists between two parties to pay off their respective debts by way of mutual deduction.  Setoff is permitted only where there is mutuality of claims between the parties.  Mutuality of claims requires that the claims exist between the same parties acting in the same capacities.

*Meeker*, 572 Fed. Appx. at 691 (affirming denial of setoff) (internal citations omitted).  *See also Everglade Cypress Co. v. Tunnicliffe*, 148 So. 192, 193 (Fla. 1933) ("Set-off at law and in equity is the right which exists between two parties, each of whom under an independent contract owes an ascertained amount to the other, to set off their respective debts by way of mutual deduction . . ..").

Here, Defendants' setoff defenses do not exhibit any mutuality of claims between the parties.  There is no contract between the Receiver or the EquiAlt Entities and either defendant under which each owes an ascertained amount to the other.  The Defendants' setoff claims relate to alleged transfers to third

parties and losses Defendants claim to have suffered as a result of misrepresentations, fraudulent concealment, and promissory fraud by Rybicki. There is no claim based on any respective debts for which there could be a mutual deduction of ascertained sums owed by the Receiver, on the one hand, to Defendants, on the other.   Instead, these defenses relate to payments Defendants made to third parties or alleged wrongdoing by Rybicki.

## IV.  THE RECEIVER'S DAMAGES

In this case, the Receiver has established a liquidated sum certain plus prejudgment interest beginning from the date of each fraudulent transfer, through July 31, 2022, and continuing thereafter at a per diem rate as a decimal of 0.000118082. The Receiver is entitled to recover prejudgment interest on these transfers. *See Wiand v. Dancing $, LLC*, 578 Fed. Appx. at 947 (holding that the Receiver was entitled to recover prejudgment interest on FUFTA claim, "...in light of Florida's general rule that prejudgment interest is an element of pecuniary damages."). Thus, the Receiver seeks the return of  the fraudulent transfers made to Defendants plus prejudgment interest beginning from the date of each commission payment through July 31, 2022 ($392,388.96)  and continuing thereafter at a per diem rate as a decimal of 0.000118082. The prejudgment interest calculations pertaining to the transfers made to Defendants are set forth in Exhibit 2 to Yip's Declaration.

33

## V.   CONCLUSION

For all of these reasons, the Receiver respectfully requests an order granting summary judgment on (1) Count I against Joseph Financial and Robert Armijo in the amount of $1,472,458.35, plus prejudgment interest of through July 31, 2022 of $392,388.96 and additional prejudgment interest until judgment is entered against Defendants Joseph Financial and Robert Armijo.  Further, the Receiver also requests post-judgment interest and costs.

Respectfully submitted,

**/s/ Katherine C. Donlon**
Katherine C. Donlon, FBN 0066941
kdonlon@jclaw.com
JOHNSON, CASSIDY, NEWLON & DeCORT, P.A.
2802 N. Howard Avenue
Tampa, FL 33067
Tel: (813) 291-3300
Fax: (813) 324-4629

and

R. Max McKinley, FBN 119556
mmckinley@guerraking.com
GUERRA KING P.A.
1408 N. Westshore Blvd., Suite 1010
Tampa, FL 33607
Tel: (813) 347-5100
Fax: (813) 347-5198

*Attorneys for Plaintiff*
*Receiver Burton W. Wiand*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 3, 2022, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will send notification of electronic filing to all counsel of record.  I further certify that on that same date, the following parties were served via email:

James Gray **and**
Seek Insurance Services, LLC
13702 W. Chaparosa Way
Peoria, AZ  85383
jdginsurance@yahoo.com

Patrick Runninger **and**
The Financial Group, LLC
3961 E. Chandler Blvd., #11-369
Phoenix, AZ  85048
prunninger@gmail.com

DeAndre Sears **and**
MASears LLC d/b/a Picasso Group
9400 Angelfish Drive
Las Vegas, NV  89117
andresears@msn.com

Anthony Spooner **and**
Rokay Unlimited, LLC
829 St. James Lanie
St. George, UT  84790
tspooner@1federal.com

**/s/ Katherine C. Donlon**