## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BURTON WIAND, as
Receiver for EquiAlt
LLC, EquiAlt Fund, LLC,
Fund II, LLC, EquiAlt Fund III,
EA SIP, LLC, EquiAlt
Secured Income Portfolio REIT,

       Plaintiff,

                           Case No.: 8:21-cv-00361-SDM-AAS

v.

FAMILY TREE ESTATE
PLANNING, LLC, et al.,

       Defendants.

_____/

## MEMORANDUM OF POINTS AND AUTHORITIES BY ROBERT JOSEPH ARMIJO AND JOSEPH FINANCIAL, INC. IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

In the Eleventh Circuit, the movant on a motion for summary judgment has the initial burden to "demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute."[1]  The Receiver's

---

[1] *Compania de Elaborados de Café v. Cardinal Capital Mgmt.,* 401 F.Supp.2d 1270, 1274 (S.D. Fla. 2003).

papers fail to meet this burden.  Not only do the papers fail to address all of the facts underlying the relevant legal questions, but they fail to address two of the essential legal questions determining whether EquiAlt, LLC – Fund I, Fund II, and the REIT operated as a Ponzi scheme.

In sum, the motion should be denied for the following reasons:

- **First**, the Receiver's claims against Defendants Robert Joseph Armijo ("Armijo") and Joseph Financial, Inc. ("Joseph Financial") (collectively "Defendants") are controlled by federal, not Florida, law.  The SEC has filed an action for restitution against the Defendants in the U.S. District Court for the Southern District of California.  If the Receiver is not required to follow the guidelines set forth in *Securities & Exchange Commission v. Liu,* __ U.S. ___, 140 S. Ct. 1936, 1947 (2020), including disgorgement of "*net* profits" only if such relief "may be appropriate or necessary for the benefit of investors," the Receiver and the SEC can circumvent the holding in *Liu.*

- **Second**, even if the Receiver's fraudulent transfer claim is not preempted by *Liu*, the Receiver has failed to show that no genuine issue of any material fact exists on two elements of the alleged Ponzi scheme in this case: (1) that EquiAlt conducted little or no legitimate business operations as represented to investors; and (2) that the business operations of EquiAlt produced little or no profits or earnings.  Indeed, the Receiver has offered *no* evidence on these elements, and material facts exist disputing them.  Neither the Receiver nor his

expert, Maria Yip ("Yip"), considered these elements when expressing their inadmissible opinions that EquiAlt was a Ponzi scheme. And, without a Ponzi scheme, the Receiver's fraudulent transfer claims fail.

- **Third**, triable issues of material fact exist concerning whether Armijo and Joseph Financial received transaction-based compensation in good faith and for a reasonably equivalent value. Armijo conducted a reasonable investigation of EquiAlt before and during his involvement in the sale of EquiAlt securities, and the amount of investment received by EquiAlt in connection with Armijo's efforts was over seven times greater than what Joseph Financial received in transaction-based compensation. Because EquiAlt received more than a reasonably equivalent value, not only the fraudulent conveyance, but the unjust enrichment claim fails.

- **Finally**, the Receiver has not negated any of the facts supporting the affirmative defenses, including the offset claims by Armijo and Joseph Financial against the Receiver based on fraud, breach of contract, and tort of another liability. These offset issues, if resolved in favor of the Defendants, far exceed the amount being sought by the Receiver against them.

## OPERATIVE FACTS

The operative facts in this case are interesting and tragic. Armijo graduated from high school in 1999. After briefly attending college, he went into the life

insurance business.  He formed Joseph Financial in 2008, through which he conducted much of his life insurance business.

In 2012, he became a licensed investment advisor representative in California. Between that date and 2016, he worked for two registered investment advisory firms before founding, in 2016, his own firm, Joseph Financial Investment Advisors, LLC ("JFIA"), a California limited liability company and Registered Investment Advisor. JFIA maintained its office in San Diego, California, and operated until 2021, when it ceased doing business due to EquiAlt.

## A.    Introduction To EquiAlt

The tragic part of this story begins in 2013 when Armijo was introduced to EquiAlt by another life insurance agent, Dale Tenhulzen ("Tenhulzen"). Tenhulzen was involved in the sale of EquiAlt Fund I to some of his insurance clients.  Armijo and Tenhulzen agreed to put on dinner seminars through Tenhulzen's firm, the Live Wealthy, Die Wealthy Institute.  If the seminars later resulted in insurance or annuity business or EquiAlt sales, they would split the commissions in a combined check. (Armijo Dec., Exh. 1, ¶ 6.)

## B.    EquiAlt's False Assurances

In January 2016, Armijo's business relationship with Tenhulzen ended and Armijo was asked by clients to contact EquiAlt on their behalf.  This led to a lengthy discussion with EquiAlt managing director Barry Rybicki ("Rybicki") during which Rybicki spoke to him about becoming involved in selling EquiAlt debentures.  Rybicki discussed the history and financial health of EquiAlt, and how sales agents were paid

through a compensation program by BR Support Services, LLC.  Armijo was told that EquiAlt was advised by a securities law expert from one of the leading law firms in the U.S., Paul Wassgren ("Wassgren"), who had created the compensation program.  He was told that his Series 65 Investment Advisor Representative license was sufficient for him to sell EquiAlt securities, and he did not need a Series 7 (general securities) license required for a stockbroker.  He was assured that the SEC had looked at this compensation arrangement twice,  and that although they did not like the way it was set up, they did not have a problem with it.  (Armijo Dec., Exh. 1, ¶¶ 8-14.)  Armijo was then provided with EquiAlt paperwork prepared by Wassgren and his law firm.  He was impressed by the thoroughness of it.  He reviewed the PPM provided to him by EquiAlt and found nothing unusual in the business plan or interest amounts of the debentures, typically 6 – 12%, or the payment of transaction-based income to sales agents.  He was assured by Rybicki on numerous occasions, as well as by the Prospective Purchaser Questionnaire, that Wassgren would continue to be involved with EquiAlt and ensure compliance with Regulation D, which requires that there be no more than 35 unaccredited investors.

Between 2017 and 2019, Armijo would receive multiple further assurances from Rybicki and Wassgren directly that his "Series 65 is good to go!".  (Armijo Dec., Exh. 1, ¶ 46.)

On April 29, 2018, Armijo signed a written contract – the Selected Dealer Agreement – to sell EquiAlt Secured Income Portfolio REIT, Inc. shares.  The Selected Dealer Agreement states that some of the sellers of stock will be financial advisors, and

Armijo made clear on his signature page that he had a Series 65 license. (Armijo Dec., ¶ 54, Exhibit L, pp..)   Wassgren personally assured Armijo that he could sell REIT shares with a Series 65 license. (Armijo Dec., Exhibit A, ¶ 49, Exh. K.)

## C.    Due Diligence

Between January 2016 and February 2020, Armijo did all that one would expect as a financial advisor:  He conducted due diligence on EquiAlt and its founders, Brian Davison ("Davison") and Barry Rybicki. (Armijo Dec., Exh. 1, ¶¶ 18, 30.)  This due diligence involved, among other things, reviewing online Florida assessor records to confirm that EquiAlt owned properties as represented, visiting the EquiAlt office in-person and talking to its employees about EquiAlt's operations, reviewing the REIT's audited and unaudited financial statements, and doing various Google searches on EquiAlt's executive team. (*Id.*)  He even invested in an EquiAlt debenture himself. (*Id.* at ¶ 18.G. )

## D.    Participation In Sales To Customers

During the period of January 2016 through February 2020, Armijo and Joseph Financial were involved in the sale of debentures to about 66 investors, all but three of whom purchased debentures in EquiAlt Fund I; (the remainder purchased in Fund II). In addition, they were involved in the sale of EquiAlt REIT stock to about nine investors. (*See* Doc. 142-1, 142.2, ¶ 30.A.)  Of these investors, about ten were also clients of JFIA  (Armijo Dec., Exhibit 1, ¶ 30.A.).  All received payments on time.

Armijo found potential accredited investors, and in some instances, potential investors contacted him.  He did not have authority to consummate any sale of an

EquiAlt debenture or EquiAlt REIT security, but he did discuss the suitability of the investment with the potential clients, how he was compensated, and how transaction-based compensation was paid through BR Support Services. (Armijo Dec., Exhibit 1, ¶¶ 20-24, 33.)

### E.   The Ongoing Nightmare

After the SEC Receivership, in February 2020, what appeared to be a good investment opportunity turned into a nightmare.  Armijo and Joseph Financial have been investigated by the SEC; sued in five lawsuits; and commenced a litigation against Wassgren and his law firms, DLA Piper LLP and Fox Rothschild LLP. (Exhibit 1, Armijo Dec., ¶ 66.)  His losses exceed $14 million dollars.  (*Id.* at ¶ 68.) People most precious to him have questioned his integrity.  He has become personally associated with an EquiAlt Ponzi scheme.  He has lost JFIA, and his personal relationships with banks and brokerage houses have been terminated.  He has difficulty doing any business–related transaction, even renting a place to live.  (*Id.* at ¶¶ 69-70.)

### ARGUMENT

### A.   *Liu* Limits The Receiver's Recovery To "Net Profits"

*Liu v. SEC*, ___U.S. ___, 140 S.Ct. 1936 (2020), controls any recovery by the Receiver in this case.  The Receiver has brought two claims for relief, one based on the FUFTA statute (FLA Stat. §§ 726.101 – 726.201), and the other seeking disgorgement. *Liu* preempts Florida law to the extent it conflicts with it.

*Liu* preempts the Florida statute by limiting disgorgement to the victims' harm. Under *Liu*, disgorgement of "net profits" is lawful only to the extent it is needed to compensate harmed investors.  *Liu*, *supra*, 140 S.Ct. at 1948.

*Liu* is not limited to SEC enforcement actions, and applies to this receivership action.  The Receiver was appointed at the request of the SEC.  He is empowered to enforce state laws only as to any issue not governed by the Constitution or treaties of the United States or *Acts of Congress* (emphasis added).  28 U.S.C. § 1652; *Flava Works, Inc. v. City of Miami,* 609 F.3d 1233, 1237 (11th Cir. 2010).   The present case is controlled by an Act of Congress.  15 U.S.C. § 78u(d)(5)—the section *Liu* interprets— is the same section that "empowers the Court to grant equitable relief in securities cases," including "the power to make full use of an equity receiver to return funds to investors."   *SEC v. Tca Fund Mgmt. Grp. Corp.*, No. 20-21964-CIV-ALTONAGA/Goodman, 2022 U.S. Dist. LEXIS 145733, at *32 (S.D. Fla. Aug. 4, 2022).

Section 78u applies not only to the SEC, but also to the Receiver.  To allow the Receiver to proceed under a fraudulent transfer theory would conflict with an overlapping case pending against Armijo in U.S. District Court for the Southern District of California (*SEC v. Robert Joseph Armijo and Joseph Financial, Inc.,* Case No. 3:21-cv-01107-TWR-AHG.)   The Receiver and the SEC regularly confer with each other Wright Dec., Exhibit B, ¶ 4, Exh. C, pp. 13, 14.) The Receiver and the SEC use the same expert – Maria Yip – in both cases.  Yip has testified as to a $1,086,835 million dollar overlap (*id.* at ¶ 3; Yip Depo. 91:10-92:22; Depo. Exh. 61, p. 4).

**B.    The Declarations Of Burton Wiand, Philip Feigin, And Maria Yip Are Subject To Multiple Evidentiary Objections**

It may be helpful to determine the admissible evidence to be considered by the Court on this motion:   The Motion for Summary Judgment is based on the declarations of Burton Wiand, Philip Feigin, and Maria Yip.   Objections to their declarations follow.

In paragraph 6 of the Wiand declaration, he states that the information presented in his declaration "is based on [his] personal observations, information gleaned from the business records of the Corporate Defendants and Relief Defendants, and the examination of the financial data and banking records that has been conducted under [his] direction."   In his deposition, he identified paragraphs 9 - 22 as based on his review of company records and/or conversations with a former Chief Financial Officer of the company (Wright Dec., ¶ 4, Exh. C; Wiand Depo. 31:19-34:4. ).   Armijo objects to these paragraphs on the ground of hearsay (Fed. R. Evid. 803) and the Best Evidence Rule (Fed. R. Evid. 1002) and requests that the Court not consider them. Armijo also objects to paragraph 9 of the declaration to the extent it refers to "Ponzi scheme," on the ground that Wiand is not a designated expert in this case; and the opinion is neither rationally based on the witness's perception, *i.e.,* first-hand knowledge, or helpful in understanding his testimony under Rule 701 of the Federal Rules of Evidence.

Mr. Feigin has been designated as a securities expert in this case and offers a wide-ranging declaration that includes everything from background information about

the securities industry to whether EquiAlt sales agents were, at a minimum, "brokers."

Armijo objects to the entire declaration on the ground that his testimony is on issues

of securities law.  *United States v. Schultz,* No. 8:02-CR-111-T-17-MAP, 2005 U.S. Dist.

LEXIS 62210 at *5 M.D. FLA February 24, 2005 (holding that an expert's testimony

on issues of law is generally inadmissible and that testimony encompassing an ultimate

conclusion based on the facts of a securities case is inadmissible); *see also Berckeley Inv.*

*Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d. Cir. 2006) (holding that whether a party

complied with or violated legal duties constitutes an impermissible legal opinion even

if offered by a well-qualified expert including "an experienced former SEC attorney").

   Objections to Yip's declaration are raised in the next section.

**C.   The Receiver Offers No Admissible Evidence On Two Essential Elements of A Ponzi Scheme:  (i) Little Or No Legitimate Business Operations; And (ii) Little Or No Profits Or Earnings**

   "***Not all securities frauds are Ponzi schemes***."   Edith H. Jones, Chief Judge, U.S.

Court of Appeals for the Fifth Circuit, *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 526-27

(5th Cir. 2012) (emphasis added).  In the Eleventh Circuit, to prove the existence of a

Ponzi scheme, the Receiver must prove that: "(1) deposits were made by investors; (2)

the Receivership Entities conducted little or no legitimate business operations as

represented to investors; (3) the purported business operations of the Receivership

Entities produced little or no profits or earnings; and (4) the source of payments to

investors was from cash infused by new investors."   *Wiand v. Waxenberg*, 611

F.Supp.2d at 1299, 1312 (M.D. Fla. 2009). The application of this four-factor test is undisputed—Wiand quotes these factors in his brief. (Doc. 142 at 16.)

The key question is "whether the [EquiAlt] Fraud Scheme meets the Eleventh Circuit's test for a Ponzi scheme." *Kapila v. TD Bank, N.A. (In re Pearlman)*, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010). "The [EquiAlt] Fraud Scheme may resemble a Ponzi scheme, but [if] it does not satisfy ***all*** four of the factors set forth above," then it is "not a Ponzi scheme." *Id., see also Wiand v. Waxenberg*, *supra*, 611 F.Supp.2d at 1318 (holding that although Wiand's expert "has presented probative, if not persuasive, evidence, there is "a material issue of fact precluding summary judgment as to whether [defendant] was operating a Ponzi scheme").

The Receiver's proffered Ponzi scheme expert, Yip, did not analyze all of these four factors. She testified that she was neither "given a definition of a Ponzi scheme" nor "provided with any legal cases on the subject of Ponzi scheme" (Wright Dec., Exh. 3; Yip Depo. at 40:19-41:9.) In determining whether EquiAlt was a Ponzi scheme, Yip looked at only one legally relevant factor – whether money raised from new investors was used to pay old investors. In short, Yip did not consider the second nor third Ponzi scheme factors. (*See, e.g.*, Yip Depo. at 102:22-25 [stating she did not consider the percentage of investor funds that were used to purchase real property by EquiAlt].) Her general review of the insufficiency of revenues does not suffice. (*Id.* at 101:17-102:21.)

Thus, Armijo objects to Yip's opinion that EquiAlt was a Ponzi scheme on the ground that it reflects an incorrect understanding of the law. *See Allegro Ventures, Inc.*

*v. Almquist*, No. 11-cv-2009-L(WVG), 2014 U.S. Dist. LEXIS 64008, at \*15-16 (S.D. Cal. May 8, 2014); *Liqwd, Inc. v. L'Oréal United States*, No. 17-14-JFB-SRF, 2019 U.S. Dist. LEXIS 233246, at \*17 (D. Del. June 25, 2019).  It also is objectionable because it is not based on sufficient facts or data, *i.e.*, there is no consideration by Yip of the extent to which the Receivership entities conducted legitimate business operations. Nor is there any consideration by Yip of whether the business operations of the Receivership were profitable.  Fed. R. Evid. 702(b).

To be clear, Yip has some admissible testimony relating to whether money from new investors was used to pay old investors.  Some of Yip's findings are particularly helpful to Armijo:  She found no evidence that new investors were paying old investors principal or interest until at least December of 2016 in EquiAlt Fund I, ten months after Armijo began his involvement in selling EquiAlt Fund I debentures (Exhibit 2, Wright Dec. ¶ 2, Exh. A.)  She also found that the earliest months investors were paid interest only from other investor funds was October 2017.  Thus, there is no way Joseph Financial can possibly be charged with receiving fraudulent transfers before December 2016 and arguably before October 2017.  Similarly, in Exhibit 9 of Yip's report for Fund II (Doc. 142-1 at p. 44); the earliest month at which distribution to investors (including principal and interest) were paid from other investor funds was December 2017; with respect to the payment of interest only, it was February 2018. Both of these dates are long after Joseph Armijo received $20,000 in compensation (June 26, 2017) in connection with a sale of an EquiAlt Fund II debenture (*see* Yip Dec., Exhibit 15 Doc. 142-1, p. 105-106); nor can he be faulted for failing to further

investigate EquiAlt in January 2016.  In other words, no amount of due diligence in January 2016 could have discovered a Ponzi scheme because, as Yip admits, no Ponzi scheme existed at that time.

Importantly, Even if Armijo had conducted a massive forensic accounting investigation in January 2016 like Yip did, he would have found no evidence that new investors were paying old investors.

**D.    Evidence Exists To Create Disputed Issues Of Material Fact On Whether EquiAlt Conducted Substantial Business Operations And Made Substantial Profits**

There may be a reason why the Receiver did not provide evidence on the second or third Ponzi scheme factors:  The evidence shows that EquiAlt conducted legitimate business operations as represented to investors and that those operations produced substantial profits or earnings.

According to the Receiver, 50% of EquiAlt investor monies was invested in real estate.  (Wright Dec. ¶ 4, Exh. C; Wiand Depo. at 51:12-17.)  When the Receiver took over, in February 2020,  EquiAlt owned "over 300 properties and over 400 doors" ("doors" refers to the number of units that could be rented).  (*Id. at 4;* Wiand Depo. at 54:24-55:4.)  The Receiver now has over $70 million in cash, and almost 200 properties remain for sale.  (*Id. at 4;* Wiand Depo. at 52:24-53:2; 54:24-55:9; 63:22-64:2.)  This is a far cry from the "little or no legitimate business operations," that the second factor requires.

One of the most important sources of evidence about EquiAlt's business success is realtor Tony Kelly.   In June 2014, he began working full time at EquiAlt as a Junior

Asset Manager.  He was engaged in reviewing upcoming tax deed options on real property.  He also had oversight over rehabilitation of properties, getting them rented, and then going to the next project.  (*Id. at  5;* Exh. D; Kelly Depo. at 18:11-19:24.)  In September of 2016, he was promoted to Portfolio Manager of the company.  As Portfolio Manager, he reported to EquiAlt Chief Executive Officer, Davison.  (*Id. at 5;* Kelly Depo. at 19:25-20:12.).  When EquiAlt went into receivership in February 2020, Kelly was one of the EquiAlt employees hired by the Receiver.  He continues to be employed by the Receiver as General Manager of EquiAlt.  (*Id.* at 5; Wiand Depo. 29:23-30:22.)

Testifying about the EquiAlt acquisitions and rents obtained at the end of 2016, Kelly stated that EquiAlt was obtaining a net return on investment of 14.9% –"[t]hat's kind of what everyone was shooting for was between 12 and 16 percent."  (*Id. at 5;* Kelly Depo. at 82:2-17.)  He also stated that he was unaware of any "bad real estate deals" involving property sold by EquiAlt.[2]  (*Id.* at 127:11-19.)

At the beginning of 2017, EquiAlt was able to purchase about 60 properties.  At this point, Kelly had no concerns over the economic health or financial health of the EquiAlt funds.  (*Id.;* Kelly Depo. at 131:9-132:1.)  There was no concern about the funds being short until early 2019, when the subject was discussed with Davison.  (*Id.*; Kelly Depo. at 61:7-19.)

---

[2] This is likely because residential real estate in EquiAlt's three largest markets – Hillsborough County, Florida, Pinellas County, Florida, and Polk County, Florida – was up 69%, 73%, and 74%,  respectively, from 2012 through 2017.  (Exhibit 3, RJN at Exh. A.)

As for the fourth factor, the evidence shows that any alleged fraud began years later than when the Receiver claims.  Indeed, Yip concluded that investor funds were **not** being used in EquiAlt Fund I to pay prior investors before December of 2016: **"<u>Before that date, . . . [EquiAlt] would have sufficient money without the use of new investor money to be able to make the distribution.</u>"** (Wright Dec., ¶ 3, Ex. B; Yip Depo. at 62:7-63:12, 67:18.)  When asked whether, "prior to December 2016 EquiAlt was doing something improper or illegal relating to, for example, a Ponzi scheme," Yip answered that she does not "have an opinion as to whether they were doing something illegal." (*Id.,* Yip Depo. at 69:22-70:6.)

Thus, the Receiver's unfounded assertion that "the Insiders and the EquiAlt Entities operated the Funds and the REIT as a Ponzi scheme since their inception" must be ignored.  (Doc. 142 at 17.)  *See Smith v. Quintiles Transactional Corp.*, 509 F.Supp.2d 1193, 1201 (M.D. Fla. 2007) ("conclusory allegations and unwarranted deductions of fact are not accepted as true" on summary judgment).

Further, Yip's analysis relies on an incorrect assumption.  Yip testified that EquiAlt was "selling its assets at the time that it needed to make a distribution and with those proceeds would have sufficient money . . . without the use of new investor money to be able to make the distribution."[3]  (Exhibit 2, Wright Dec. ¶ 3, Exh. B; Yip Depo. at 62:15-63:12.)  Yip claimed that the selling of these rent producing properties

---

[3] There seems to be a factual issue about whether this was done.  Wiand testified that "[t]here weren't any resales." (Wright Dec. ¶ 4, Exh. C; Wiand Depo. at 57:12-17.) Yet, Yip testified that resales were essential and necessary prior to December 2016 in order to keep EquiAlt afloat. (*Id.* at ¶ 3; Exh. B; Yip Depo. at 62:7-63:12; 69:22-70:6.)

was a problem.  But, EquiAlt's business model involved raising capital by selling debentures, buying distressed, typically foreclosed, real estate, and improving the real estate for rental **or resale**.  (Wright Dec.,  ¶ 11, Exh. J; EquiAlt Private Placement Memorandum, marked as exhibit no. 32 to the December 6, 2019 deposition of Davison; EquiAlt marketing materials, marked as exhibit no. 109 to the March 8, 2022 deposition of Wassgren.)  (*Id.* at ¶ 12, Exh. K.)

As for EquiAlt's solvency after December 2016, Yip testified that she had no knowledge of what real estate was available that could have been sold to pay obligations at that point, and that she never looked into that issue.  (Wright Dec., ¶ 3, Exh. B; Yip Depo. at 86:6-87:19.)  She never considered the numbers of legitimate business transactions by EquiAlt.  (*Id.* at 87:6-18.)  There is a factual issue as to whether EquiAlt could have sold some of its real property in that time period to make its distributions without the use of investor money to make those distributions.

As Exhibit 7 to the Yip report reveals that in December 2016, EquiAlt needed to make a distribution to investors of principal and interest of over $2.1 million.  The fact that it used about $1.4 million of other investor funds to do so does not negate the possibility that this occurred in anticipation of the sale of real property, as it would be highly unlikely that principal and interest could be returned to investors without the sale of real property.  EquiAlt Fund I was able to make monthly interest payments without using monies from other investors until October 2017.  This is also shown in Exhibit 7 and may be the earliest date where the Receiver could argue that a Ponzi scheme exists – if the other elements are proven.  (Doc. 142-1 at p. 40.)

**E.     It Is Undisputable As A Matter Of Law That Armijo And Joseph Financial Provided Consideration In Excess Of The Benefit They Received From EquiAlt**

Armijo and Joseph Financial raised the "good faith and for reasonably equivalent value" defense provided in section 726.109(1) of the FUFTA.  In response, "[t]he [Receiver] bears the burden of showing that a transfer was not for reasonably equivalent value."  *In re Rodriguez*, 895 F.2d 725, 726 n.1 (11th Cir. 1990).  "Whether 'reasonably equivalent value' or 'fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.'"  *Wallace v. McFarland (In re McFarland)*, 619 F.App'x 962, 974 (11th Cir. 2015) (quoting *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012)).

The Receiver argues that "[a] number of courts have held that illegal consideration does not constitute reasonably equivalent value."  (Doc. 142 at 19.)  The Receiver's cases are distinguishable because they contain dicta, *see Wing v. Dockstader*, 482 F.App'x 361, 366 (10th Cir. 2012) (because defendants did not challenge this basis until their reply brief, the issue is forfeited); *Klein v. Stewart*, No. 2:19-cv-00726-DN-PK, 2021 U.S. Dist. LEXIS 217933, at *22-23 (D. Utah Nov. 9, 2021) ("Because [defendant] does not identify any value received by the Receivership Defendants, his good faith defense fails as a matter of law."); the underlying contract was clearly unenforceable on its face, *see Armstrong v. Collins*, Nos. 01 Civ. 2437 (PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620 (PAC), 2010 U.S. Dist. LEXIS 28075, at *89-93 (S.D.N.Y.

Mar. 24, 2010) (contract for escort services); or the debtor was directly involved with the fraud, *see Ruffini v. Norton Law Group PLLC (In re Ruffini)*, Nos. 11-78841-reg, 12-8396-reg, 2014 Bankr. LEXIS 733, at *21-22 (E.D.N.Y. Feb. 25, 2014) (attorney induced client into retainer agreement by fraud).

Wiand ignores the fact that courts have made an important distinction between contracts that are illegal on their face and contracts that are only "illegal or unenforceable because a party was unlicensed":

> While, in fact, there may be instances in which a contract, or transaction, or event that is illegal or unenforceable might nonetheless support reasonably equivalent value, **such as one that is illegal or unenforceable because a party was unlicensed**, or a statute of limitations may have run, when the transaction is one that is absolutely prohibited by law it will rarely, if ever, constitute reasonably equivalent value.

*Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) (emphasis added).

In *Liberatore v. 21st Century Satellite Commc'ns., Inc.*, 278 B.R. 577, 583-84 (Bankr. M.D. Fla. 2002), the defendant procured investments for commission and was not licensed to sell securities. Despite these facts, the court held that "the payments of commissions cannot be set aside as a fraudulent transfer." *Id.* at 584. *See also,* id*.,* 278 B.R. 577 (payments to unlicensed brokers for the sale of participation interests ultimately found to be securities under Florida law did not have to be disgorged, if the brokers did not know of the unlawfulness of the transaction, because the brokers provided value).

Here, Wiand has no facts showing that Armijo knew about the underlying Ponzi scheme.  To the contrary, Armijo was unaware of any past, ongoing, or potential fraud.  (Exhibit 1, Armijo Dec. at ¶¶ 18; 30.E., H., 71).

Further, Armijo relied on EquiAlt Funds' taking the legally required steps for a Regulation D offering, inquired of Rybicki, and received assurances that the numbers of unaccredited investors were within the limitations for the issuers pursuant to the applicable exemptions from registration.  As to his licensing, Armijo specifically asked Wassgren, directly and indirectly through , Rybicki, whether his qualifications—which he truthfully and completely disclosed—were sufficient.  Counsel responded affirmatively several times.  These facts are substantiated by the testimony of Armijo and by documentary evidence, which includes emails and text messages between and among Armijo, Rybicki, and Wassgren, and confirming that Wassgren responded to Defendant's specific questions about licensing.  Indeed, the Receiver has charged Wassgren with this type of conduct in his Los Angeles Superior Court complaint, which were evidentiary admissions in this case. (Wright Dec., ¶ 9, Exh. H, p. 10, sub. ¶¶ 57, F, G, and H.)

The Receiver also argues that Armijo could not have given reasonably equivalent value "because Ponzi schemes are by definition insolvent" and "[t]he payments of commissions to [Armijo] served only to increase the insolvency of the Scheme and to harm." (Doc. 142 at 20.)  Not so.  Courts have consistently held that a broker can provide reasonably equivalent value when selling securities that were later found to be in furtherance of a Ponzi scheme. *See, In re Churchill Mortgage Inv. Co.*, 256

B.R. 664, 681 (Bankr. S.D.N.Y. 2000.); s*ee also Balaber-Strauss v. Lawrence,* 264 B.R. 303, 308 (S.D.N.Y. 2001).

**F.    Armijo Meets The Subjective And Objective Tests Of "Good Faith" Because He Conducted A Reasonable Investigation And Learned Nothing Negative About EquiAlt**

Although "all payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent," "[s]ome of these payments are properly avoidable" and "others are not." *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002). "None are automatically avoidable." *Id.* "Courts must assess the good or bad faith of each recipient to determine which are avoidable and which are not." *Id.* (holding that "brokers who sell the debt instruments that allow a Ponzi scheme to continue" may also have a good faith defense if they took "the steps a prudent broker acting in good faith would take before selling the debtors' notes"). *Id.* at 659.

"To determine whether a transferee acted in good faith for purposes of section 548(c), the court must look at what the transferee objectively 'knew or should have known,' and conclude that the transferee did not act in good faith because it had sufficient knowledge to place it on inquiry notice of the voidability of the transfer or the debtor's insolvency." *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 254 (Bankr. M.D. Fla. 2003).

Armijo took the steps a prudent financial advisor would take in fulfilling his fiduciary duty before recommending or participating in the sale of EquiAlt debentures

or the REIT stock.  He conducted fundamental analysis – to the extent that such information was available; determined whether the Florida real estate market was appreciating; inspected County Assessor records to confirm that EquiAlt was purchasing properties at distress sales; and that the properties were debt free.  He also confirmed that EquiAlt had purchased numerous properties, visited the company headquarters, and conducted an internet search on the backgrounds of Davison and Rybicki.  (Armijo Dec., Ex. A, ¶¶ 30 A.-H.)

**G.   Armijo's Affirmative Defenses Are Valid, Or Create Issues Of Material Fact Precluding Summary Judgment**

### 1.  Statute Of Limitations (Affirmative Defense Numbers 7 & 9)

Armijo's seventh and ninth affirmative defenses assert that the Receiver's claims are barred by the statute of limitations.  The Receiver concedes that the statute of limitations "limits them [from recovering] fraudulent transfers received by the Defendants from February 14, 2017, forward."  (Doc. 142 at 31.)

Twenty-seven transactions totaling $495,242.03 occurred before February 14, 2017 (*see* Doc. 142-1 at 105.)   The Receiver is barred from clawing back these transactions on its constructive fraud claims.  (FLA Stat. § 726.110(2).)

### 2.  Standing (Affirmative Defense Number 2)

Armijo's second affirmative defense is that the Receiver lacks standing to bring his claims because he already has assets sufficient to pay all EquiAlt creditors and investors.

The Receiver argues that this affirmative defense "is without merit" because: (1) "[w]hether the Receiver has sufficient assets to pay the EquiAlt creditors and investors" is irrelevant to whether "the Receiver is entitled to prevail on his actual and constructive fraudulent transfer claims against Defendants"; and (2) "the Receiver does not have sufficient assets in the Receivership estate to pay the $210,270,218 of principal and interest owed to the investors."  (Doc. 142 at 22.)

As stated in Section A, above, *Liu* controls any recovery by the Receiver in this case and states that disgorgement of "net profits" is only lawful to the extent it is needed to compensate harmed investors.  *Liu*, *supra*, 140 S. Ct. at 1948.  The Receiver's solvency is an issue on which the Receiver has refused to make disclosure of the value of its most valuable asset – the settlement with Wassgren, and the Receiver's calculation of the amount of assets needed to pay creditors is wrong.  The starting number for investors is not $178,337,208; it is $152,833,089 which represents the amounts of investor claims received by the Receiver.  (See Wright Dec., ¶ 4, Exh. C; Wiand Depo. at 92.)

If a figure of 175 unsold homes is used and each home sold for $473,000, the receivership would have sufficient funds, when added to the $70 million already obtained to pay the investor claims.  This number drops to $414,000 if there are 200 unsold homes.  Wiand testified that he does not know the values of the remaining unsold properties (*Id.* at ¶ 4, Exh. C; Wiand Depo. at 65:22-24).  Wiand also testified that he did not put a value of any kind on the amount that he might receive from Wassgren or the law firms (*Id.* at 4, Exh. C; Wiand Depo. at 77:23-78:3).

### 3.  Limit of Value Transfer (Affirmative Defense Number 5)

Armijo's fifth affirmative defense is that, to the extent Armijo received any alleged voidable transfers under FUFTA, any judgment must be limited to the value of the transferred assets or amounts necessary to satisfy the individual claims, whichever is less.

As a preliminary matter, the Receiver argues that Armijo does "not identify the 'individual claims' to which this defense refers."  (Doc. 142 at 22.)  The individual claims refer to the Proof of Claim submitted by an investor or other harmed person to the Receiver to be eligible to receive a distribution from the Receiver.  Indeed, as the Receiver states in his Opposition to Armijo's Objections to the Magistrate Judge's Order, "[a]ny monies garnered by the Receiver through this action are for the benefit of investors who have submitted claims through the court-approved claims process." (Doc. 176 at 4.)

The Receiver next argues that it "is entitled to judgment against [Armijo] for the total amount of the fraudulent transfers they received plus prejudgment interest." (Doc. 142 at 22-23.)  For the same reasons as stated in Sections A and G.2., above, The Receiver's attempt to recover the entire compensation received by Armijo under FUFTA is inconsistent with *Liu*, *supra*, 140 S. Ct. 1936, and preempted by federal law.

### 4.  Offset (Affirmative Defense Number 6)

The sixth affirmative defense is that, to the extent Armijo and Joseph Financial received any alleged voidable transfers under FUFTA, they are entitled to the remedies and offsets for any value given as to the exchange for the alleged transfers.

The Receiver argues that "[t]here is no such affirmative defense under Chapter 726." (Doc. 142 at 23.) To the contrary, the Eleventh Circuit recognizes the strong federal policy toward allowing setoff in the absence of compelling circumstances, stating "there is practically a presumption in favor of allowing setoff" that may only be denied "[i]n exceptional circumstances." *SEC v. Elliot*, 953 F.2d 1560, 1572 (11th Cir. 1992).

Setoff in an equity receivership is a matter of discretion of the Court, guided by principles of equity. *Id.* ("The district court has discretion whether to allow a setoff against a receiver, and this decision will be overturned for an abuse of discretion.") (applying Florida law).

The Receiver argues that "[t]o prove that defense, [Armijo] must point to evidence in the record they provided both reasonably equivalent value for the transfers and accepted the transfers in good faith. Providing value alone is simply not a defense." (Doc. 142 at 23.) This is not the standard for offset. Indeed, the Receiver cites no case for this doctrine.[4]

Here, as in *Elliott*, the Receiver is seeking recovery against Armijo based on fraud and breach of contract which has caused enormous damages to Armijo. Armijo's offset defense is predicated on the fraud perpetrated on Armijo by EquiAlt's insiders and attorney. One of the insiders—Rybicki—fraudulently induced Armijo to

---

[4] In any event, as stated in sections E and F above, the evidence shows that Armijo provided both reasonably equivalent value for the transfers and accepted the transfers in good faith.

believe that EquiAlt was a legitimate business.   EquiAlt's former legal counsel
Wassgren fraudulently induced Armijo to sell the securities.  (*See* Wright Dec., ¶ 10,
Exh. I; Feigin Depo. at 44:2-9) ("[A]ny attorney in [Wassgren's] position had to know
better and would have known better and should have known better" with regards to
"the vague responses or guidance he gave to his clients on a number of issues"); *see
also Id.;* Feigin Depo. at 75:24-76:3: (if Wassgren was advising EquiAlt or Armijo that
a Series 65 license was adequate in selling EquiAlt securities, that would be incorrect
advice)).

    "It is one thing to disallow tracing against the receivership despite fraud, it is
quite another thing to permit the Receiver affirmatively to obtain money from a third-
party when that party's obligation has been obtained and created by fraud." *Elliott*,
953 F.2d at 1575.

### 5.  Intervening Acts (Affirmative Defense Number 10)

    Armijo's tenth affirmative defense is that the investors' damages, if any, were
caused by the acts of others, intervening, superseding or otherwise, including but not
limited to the acts of EquiAlt and/or EquiAlt's principals, over whom Armijo has no
control, and for whose acts Armijo is not legally answerable.

    The Receiver argues that he "is not suing on behalf of the investors"; rather, he
"is suing on behalf of the EquiAlt Entities to avoid the fraudulent transfers to
Defendants."  (Doc. 142 at 23-24.)  But it is because the Receiver steps in the shoes of
the EquiAlt Entities that Armijo is entitled to assert this defense.

"[T]he mere fact that the appointing order gives the Receiver the authority to bring tort claims that benefit the creditors and consumers does not create Article III standing." *Perlman v. PNC Bank, N.A.*, No. 19-61390-CIV-SMITH, 2020 U.S. Dist. LEXIS 196089, at *13 (S.D. Fla. Sep. 14, 2020). As both the *Isaiah* and *Freeman* courts noted, "[i]t is axiomatic that a receiver obtains only the rights of action and remedies that were possessed by the person or corporation in receivership." *Isaiah v. JPMorgan Chase Bank, N.A.*, 960 F.3d 1296, 1306 (11th Cir. 2020) (citing *Freeman v. Dean Witter Reynolds, Inc.*, 865 So.2d 543, 550 (Fla. Dist. App. 2003)). *Isaiah* primarily relied on *Freeman* in making its determination.

Applying the principles set forth in *Freeman*, the court in *Isaiah* found that the receivership entities were wholly dominated by persons engaged in wrongdoing and did not have "at least one honest member of the board of directors or an innocent stockholder" such that the fraudulent acts of its principals should not be imputed to the entities. *Isaiah*, 960 F.3d at 1306. The court reasoned that the principals' torts cannot properly be separated from the receivership entities, and thus the receiver, "cannot be said to have suffered any injury from the Ponzi scheme that the Entities themselves perpetrated." *Id.*; *Freeman,* 865 So.2d at 551 (distinguishing "between an honest corporation with rogue employees, which can pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a Ponzi scheme, which cannot pursue such claims."); s*ee, e.g., Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416, 429 (1972) (a receiver has

standing to assert only those claims "that the [receivership entity] could have made had it brought suit prior to entering receivership").

This case falls squarely within *Isaiah*. Indeed, the Receiver lists as Material Fact 1 that "[t]he Insiders operated the EquiAlt Entities as a Ponzi scheme from inception, and during that time the EquiAlt Entities were insolvent." (Doc. 142 at 3.)  As such, the Receiver lacks standing to pursue its claims against Armijo.

### 6. Double Recovery (Affirmative Defense Number 11)

Armijo's eleventh affirmative defense is that the Receiver is barred from recovery because the U.S. Securities & Exchange Commission is pursuing the same recovery against these Defendants for the benefit of EquiAlt investors, and the Receiver may not obtain double recovery.

It "goes without saying that the courts can and should preclude double recovery." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002); *see also* Fla. Stat. § 768.041(2) (requiring courts to set off settlements against judgments that the plaintiff would otherwise be entitled); *Hess v. Walton*, 898 So.2d 1046, 1051 n.5 ("[Fla. Stat. § 768.041] is designed to prevent a double recovery for a single injury").  "A judgment constitutes a double recovery when the two awards overlap." *Wilson v. State*, 327 So.3d 961, 963 (2021).

The Receiver argues that "[t]o the extent that the SEC is seeking a recovery for the benefit of EquiAlt investors, that has nothing to do with the basis for the Receivers' claims.  The SEC is seeking disgorgement and civil penalties against Defendants for their unlawful sale of unregistered securities as unregistered sales agents [while] [t]he

Receivers' claims are on behalf of the EquiAlt Entities which were damaged as a result of the fraudulent transfers to Defendants orchestrated by the Insiders." (Doc. 142 at 24.) The Receiver's argument strains credulity.

Recovery by the SEC and Receiver are both for the benefit of harmed investors. Indeed, *Liu, supra*, 140 S.Ct. at 1948, requires the SEC's disgorgement to be set aside to reimburse victims, and Wiand testified that it is his "hope" that all of the money paid to the SEC will come to the Receiver to compensate harmed investors(Wiand Depo. at 91:10-14.) Moreover, despite bringing different claims, the SEC and Receiver are seeking the same money. Yip, the Receiver's own accounting expert, testified that the money in the SEC case and in this case "are [from] the same transaction and the same amounts" (Wright Dec. ¶ 3; Ex. B; Yip Depo. at 92:17-25.)

The Receiver is barred from recovery to the extent that it seeks the same recovery as the SEC against Armijo, and such double recovery is prohibited.

## H.  Equitable Factors Weigh Heavily Against The Award of Prejudgment Interest

The Receiver also incorrectly argues that it is "entitled to . . . prejudgment interest" (Doc. 142 at 23). To the contrary, an award of interest is purely discretionary. The Eleventh Circuit has stated that three factors should guide a court's discretion in deciding whether to award prejudgment interest on equitable grounds: "(1) in matters concerning government entities, whether it would be equitable to put the burden of paying interest on the public in choosing between innocent victims; (2) whether it is equitable to allow an award of prejudgment interest when the delay between injury

and judgment is the fault of the prevailing party; [and] (3) whether it is equitable to award prejudgment interest to a party who could have, but failed to, mitigate its damages." *Wiand v. Lee*, 753 F.3d 1194, 1204 (11th Cir. 2014). After reviewing these three factors, a court may decide not to award prejudgment interest, or to reduce the amount of the interest. *Id.* (An award of interest may be "given in response to considerations of fairness" and should be "denied when its exaction would be inequitable.")

The cases cited by the Receiver as "applicable precedent" are distinguishable. *See Wiand v. Dancing $, LLC*, 578 Fed. Appx. 938, 942, 946 (11th Cir. 2014) (remanding because District Court failed to analyze prejudgment interest under the multi-factor test); *Wiand v. Lee*, *supra*, 753 F.3d at 1198, 1204 (same).

Armijo and Joseph Financial have suffered immensely as a result of their interactions with EquiAlt. The Receiver brought this action on the last possible day for doing so. It would be grossly inequitable to impose prejudgment interest under these circumstances.

## I. Any Judgment By The Receiver Must Be Limited To Joseph Financial Inc., As There Are No Allegations Or Proof Of An Alter Ego Relationship

Joseph Financial was compensated for work done by its employee, Armijo.

Under Florida law, "[a] plaintiff must demonstrate by a preponderance of evidence, to find justification for piercing the corporate veil, that: (i) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact nonexistent and the shareholder was in fact the alter

ego of the corporation; (ii) the corporate form must have been used fraudulently or for an improper purpose; and (iii) the fraudulent or improper use of the corporate form caused injury to the claimant." *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 255 (Bankr. M.D. Fla. 2003) (although corporation received commissions for investment in Ponzi scheme, transfers are not voidable as to corporation's president). Here, the Receiver presents no evidence supporting a piercing of the corporate veil. In fact, the Receiver never once even mentions the words "alter ego" or "piercing the corporate veil" in the Complaint or Motion.

<u>**CONCLUSION**</u>

The Receiver has not shown that there is no genuine issue as to any material fact and that the Receiver is entitled to judgment as a matter of law. To the contrary, the Receiver has not even shown that he has evidence to support two elements necessary to prove a Ponzi scheme. Even if he did, Armijo and Joseph Financial have affirmative defenses to defeat or partially eliminate their exposure to the fraudulent transfer claim. If the inference to be drawn from Yip's report is that EquiAlt Fund I was a Ponzi scheme after December 1, 2016, Armijo's exposure is reduced by $137,902; if the inference to be drawn is that it was a Ponzi scheme after October 1, 2017, the exposure is reduced by another $603,330. Yip offers no evidence showing that the EquiAlt REIT was a Ponzi scheme, reducing the recovery by another $350,975. In sum, the Receiver has not shown that he has evidence to prove his case or to negate Defendants' defenses, and the Defendants have shown that there are genuinely disputed issues or material fact.

Respectfully submitted,

Dated:  November 11, 2022

*/s/ Robert C. Wright*
Robert C. Wright
*Pro Hac Vice*
Cal. Bar No.:  051864
Wright, L'Estrange & Ergastolo
402 West Broadway, Suite 1800
San Diego, California 92101
T:  (619) 231-4844
F:  (619) 231-6710
E:  rwright@wlelaw.com
*Lead Counsel for Defendants, Joseph Financial,*
*Inc., and Bobby Joseph Armijo*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on November 11, 2022, the foregoing document was filed using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

I FURTHER CERTIFY that on November 11, 2022, I caused the foregoing to be served via E-mail upon the parties listed on the following:

James Gray *and* SEEK INSURANCE SERVICES, LLC
13702 W. Chaparosa Way
Peoria, AZ 85383
jdginsurance@yahoo.com

DeAndre Sears *and*
MASears LLC d/b/a/ PICASSO GROUP
9400 Angelfish Drive
Las Vegas, NV 89117
andresears@msn.com

John Marques *and*
LIFELINE INNOVATION and INSURANCE SOLUTIONS, LLC
10791 Inspiration Drive
Dublin, CA  94568
Jmarques9@live.com

Patrick Runninger *and* THE FINANCIAL GROUP, LLC
3961 E. Chandler Blvd., #11-369
Phoenix, AZ 85048
prunninger@gmail.com

Anthony Spooner *and* ROKAY UNLMITED, LLC
829 St. James Lanie
St. George, UT 84790
tspooner@1federal.com

*/s/ Robert C. Wright*
Robert C. Wright
(admitted *Pro Hac Vice*)
